[S. F. No. 1086.   Department Two.—August 30, 1898.]

WILLIAM PLASS, Respondent, v. CATHERINE PLASS, Executrix, etc., et al., Appellants.

RESULTING TRUST—SUPPORT OF FINDING—CONFLICTING EVIDENCE—DEED AND RECEIPT.—In an action to enforce a resulting trust in an undivided one-third of a ranch, a finding that the consideration paid therefor was six thousand dollars, of which sum the plaintiff paid one-third, is sustained by evidence for the plaintiff to that effect, though contradicted by the deed to defendant's testator, and by a contemporaneous receipt showing that the money paid was four thousand dollars.

ID.—HARMLESS FINDING—SUPPORT OF PLAINTIFF'S CLAIM.—The finding that the consideration paid was six thousand dollars is harmless, even if unsupported by the evidence, where the evidence tended to show that plaintiff paid two thousand dollars

toward the purchase. That evidence supports the plaintiff's claim to at least one-third of the property, if the consideration paid was only four thousand dollars.

ID.—DISCREDITING OF PLAINTIFF'S EVIDENCE—APPEAL.—The question of the discrediting of the plaintiff's evidence by the deed and by the receipt, is matter only to be considered by the trial court, and cannot be reviewed upon appeal.

ID.—ESTOPPEL—MISREPRESENTATION AS TO PRICE.—If the one who took the legal title in fact made the purchase for four thousand dollars, after having represented to the plaintiff that the price to be paid was six thousand dollars, and taking one-third of that amount from plaintiff for the avowed purpose of making the purchase on that basis, he and his personal representatives are estopped from claiming that the money received from the plaintiff was not used in the purchase, but was treated as a loan.

ID.—PURCHASE FROM INCOME OF TRUST PROPERTY—SECOND RESULTING TRUST NOT ESTABLISHED.—A second resulting trust in another ranch purchased by the trustee from the income of the first ranch, in which plaintiff was the beneficiary of a resulting trust as to an undivided third, is not sufficiently established by mere proof of such beneficial ownership and of plaintiff's possession in common with the trustee, who was the managing owner of the first ranch.

ID.—PRESUMPTION AS TO SHARES OF INCOME.—In the absence of proof of their agreement, or as to what were in fact their respective shares of the income of the trust property, it cannot be presumed that the beneficial owner of the undivided third thereof owned one-third or any other fixed proportion of the "income."

ID.—BURDEN OF PROOF—CERTAINTY REQUIRED.—The burden of proof rests on the one who seeks to establish a resulting trust, to show by clear proof that a definite amount of money belonging to him was furnished by him, and was used in making the purchase. The prevailing effect of the legal title cannot be overcome by surmise or conjecture, or otherwise than by satisfactory proof, showing with certainty the precise amount of money paid by the beneficiary.

ID.—EFFECT OF LACHES—SCRUTINY OF EVIDENCE—MEASURE OF PROOF.—Laches of the plaintiff, though falling short of barring his claim, should make the court more cautious in scrutinizing the evidence, and gives it strong ground to apply the rule that all the elements of a resulting trust should be clearly proved.

ID.—TRUST NOT BARRED—POSSESSION OF BENEFICIARY.—Laches cannot be invoked to bar or defeat a resulting trust in favor of one who has been in continuous and undisputed possession of the property, or who is in joint possession with the trustee, who admits the rights of the beneficiary.

ID.—NEGLECT TO ASSERT RIGHTS.—Neglect of the claimant to assert his rights as beneficiary for a long period of time while in joint possession with the trustee may be evidence tending to show that he has no rights as beneficiary, but cannot of itself consti-

tute a bar; and laches cannot be set up, so long as the rights of the beneficiary are admitted by the trustee.

ID.—EVIDENCE—DEED OF OTHER LOTS TO TRUSTEE.—A deed of other lots to the trustee made after the purchase by him of the second ranch, without knowledge of the plaintiff, and in which the latter claimed no interest, is admissible as tending to show the use of the incomes by the trustee, and to rebut the claim that he always consulted the plaintiff about business affairs; but such evidence is so slight and inconsequential that its rejection does not require a reversal.

ID.—IMPEACHMENT OF WITNESS—NAMES OF PERSONS PRESENT.—In laying the foundation for the impeachment of a witness by contrary declaration, section 2052 of the Code of Civil Procedure does not require that counsel, in stating the names of the persons present, should state negatively that no other persons than those named were present; and where only the two were present, it is superfluous to state that the person spoken to was present.

APPEAL from a judgment of the Superior Court of Napa County. E. D. Ham, Judge.

The facts are stated in the opinion.

F. E. Johnston, A. J. Hull, John T. York, and P. S. King, for Appellants.

M. M. Estee, T. B. Hutchinson, and Charles A. Shurtleff, for Respondent.

CHIPMAN, C.—This action is brought to obtain a decree that Charles W. Plass, deceased, held an undivided one-third of the premises described in the complaint, in trust for plaintiff, and that plaintiff is the owner of an undivided one-third of said property. Plaintiff had judgment, from which the defendants, Phillip Plass, as executor and individually, and Charles Plass, Jr., appeal upon bill of exceptions. Briefly stated, the court found that a resulting trust arose in favor of plaintiff in the property first described in the complaint, known as the "Haskell ranch," by reason of plaintiff's having paid one-third of the purchase price thereof; and a like trust in the property next described, known as the "Goodrich ranch," by reason of its having been purchased with the income of the "Haskell ranch," of which income plaintiff was one-third owner.

1. Appellants contend that the evidence is insufficient to jus-

tify the decision of the court, for the reason that certain findings upon which it rests are unsupported by the evidence.

First. That the purchase price of the Haskell ranch was found to be six thousand dollars, whereas the evidence showed that it was four thousand dollars; and, second, that plaintiff furnished two thousand dollars of this money with which to make the purchase. Appellants rely upon the fact that the consideration mentioned in the deed and in a contemporaneous receipt given by a temporary custodian of the money (one Calhoun) was four thousand dollars. The evidence, apart from the deed and the receipt, tended to show that Charles (now deceased) represented to his brother William (plaintiff) that the purchase price of the Haskell ranch was six thousand dollars, and when plaintiff was asked by his brother, "How much do you want of it?" he replied: "I said I would take one-third of it." Plaintiff further testified: "The next day . . . . I gave him two thousand dollars, and he says, 'I ain't got quite enough,' and I loaned him eight hundred dollars (which latter sum was afterward repaid), and he ran right up and paid the money to Calhoun. When he came back he said 'all right, that he had bought the land.'" Again: "He told me Judge Grant [the owner] told him he could have it for six thousand dollars. . . . . I counted out two thousand dollars and gave it to him. . . . . He took the two thousand dollars from me to buy a one-third interest in the property for me. . . . . He told me that he had bought the property with that money."

This evidence, uncontradicted except by the receipt and deed, certainly tended to support the finding as to the price paid, which we cannot now disturb. Furthermore, we cannot see how the finding could injure defendants, for, even if it should have shown the consideration to be four thousand dollars, and the cause of action was otherwise supported by the evidence, plaintiff had a one-third interest in the purchase, and that is what he now claims. If he paid two thousand dollars, which the evidence tended to show he did pay, and the property cost but four thousand dollars, it supports his claim to one-third interest in the purchase. The most that can be claimed is, that the deed and the receipt tend to discredit plaintiff's evidence, which is a question we cannot take away from the trial court or review here.

And this disposes of appellants' second point, that as the consideration paid was but four thousand dollars, it follows that Charles did not use William's money in the purchase at all, but had enough of his own, and used it.

The evidence tended to show that he took William's money for the purpose of making the purchase on the basis of six thousand dollars, in which William was to have a one-third interest. If Charles in fact made the purchase for four thousand dollars, after having so represented the cost to William, it might be good ground for William to claim a half-interest, instead of a third, but it surely cannot be urged in support of a claim that William had no interest whatever in the purchase. Charles could not take the money of William, under the circumstances shown here, to be used for a particular investment on his and William's joint account, and make the investment and afterward treat the money as a loan. To hold that he could do so would violate the plainest principles of equity and fair dealing. William answered on cross-examination, when asked whether he knew that his brother Charles used his, William's, money in making the purchase: "No, sir; I can't swear to it." Nor was it necessary that he should see the money paid. He gave the money to his brother Charles for the purpose of being invested in this particular property, and the investment was made by Charles in accordance with the mutual understanding. His representatives, who stand in his shoes, cannot, nor could Charles if he were alive, now be heard to defeat William's interest by claiming that the purchase was made wholly with the money of Charles, and that he kept William's money for other uses. Neither is the fact, if it be the fact, that Charles was able to buy the land on his own account at all inconsistent with his making this particular purchase for the mutual benefit of himself and his brother.

There is much evidence tending to corroborate the testimony of plaintiff as to his interest in the property. It is not without conflict with defendants' evidence; it may be "suspicious, if not highly improbable," in some particulars, as claimed by defendants; but there was sufficient evidence to support the findings, and under the rule well settled we cannot disturb them.

We think that as to the "Haskell ranch" the evidence tended to establish a resulting trust within the principles stated in *Woodside v. Hewel*, 109 Cal. 481.

Third. It is contended that the evidence does not support the finding that the "Goodrich ranch" was purchased from the incomes of the "Haskell ranch" for the sum of three thousand dollars; and that one-third of the purchase price was paid by respondent William Plass and from his own money and property; and that "up to the time of his death the said Charles W. Plass held the legal title to an undivided one-third" of said property "in trust for plaintiff."

It appears from the evidence that after the purchase of the Haskell ranch (October 11, 1856) it was leased until 1858, when Charles moved on to it with his family, and his brother William (plaintiff) also went into possession with him and remained there until Charles died, and until the present time. Plaintiff testified: "As to the income from the ranch during the time me and my brother were on it, I do not know how much it amounts to; I never kept run of it." He testified that they made money every year farming the Haskell place. "I never kept any accounts between myself and my brother, Charles W. Plass. Whenever I wanted money I would ask him for it and he would give it to me. Neither myself or my brother ever received any money as salary, wages, or monthly wages for our work there. . . . . We both went to work, we gathered the crop, it was put in the sack, and whenever it was on the market he would come to me and say: 'We can get so much for it.' Always asked my consent to sell; always consulted me to sell. As to buying things for the ranch, I would go and get what I wanted on the ranch for it and he the same. We never got anything that amounted to anything but what we consulted with one another."

He testified that he did not know how much wheat was raised on the ranch, nor the prices received between the time of purchase of the Haskell ranch and the Goodrich ranch, which latter was purchased July 3, 1863. In speaking of this purchase, plaintiff testified: "We had a transaction relating to the purchasing of the Goodrich ranch, being the second tract described in the complaint. We had money loaned over to Suisun. My brother Charles came to me and said: 'They want eighteen hundred dollars on that ranch; do you think it's worth it?' Says I, 'Yes, it is worth that.' 'Well,' says he, 'we will let them have eighteen hundred dollars,' and he sent right over to Suisun,

where he had loaned this money to Mr. Dollerhide, and there was three thousand dollars of it; . . . . we paid twenty-two hundred dollars on it. Well, after that we paid off a couple of his hired men, and he deeded the place to us. . . . . It was deeded to Charles W. Plass; he did the business. . . . . The money that was paid for the Goodrich property came from the Haskell ranch. where it was made. . . . . After we purchased the Goodrich place my brother consulted with me about it all the time. . . . . We farmed it up till four years ago, when we, Charles W. Plass and I, leased it." One of the tenants was Frank Alexander; he was a witness and testified that he leased the Goodrich ranch "the first time five years ago this fall"; "I called at the house, and Charles W. Plass was not very well at that time, and he told me to go out and bring William in; that William had as much to say about the matter as he did; that he would have to consult William; and I went out to the barn, and we went back and talked it over, us three; and the result of it was that they told me they would let me know in a few days, and in three or four days William Plass came over . . . . and told me I could have the place." The witness testified to other instances relating to the planting of wheat, when Charles told him William would have to be consulted; that Charles signed all the leases; that William "could not write; said he didn't have any education, if I remember just right."

Again he testified, when asked if Charles had ever told him what interest William had in the place, that William owned or had a third interest in the place. To several other persons it appears that Charles stated that William was interested in this place; that once when a right of way was to be obtained over it Charles stated that William would have to be consulted, and he was consulted and consented; likewise as to the sale of pasturage on the place and its management in other particulars. One witness testified that Charles and William had money loaned on the Goodrich place and had to take the place, as a witness learned from Charles Plass, the price being about four thousand dollars. Plaintiff, on cross-examination, also stated that the Goodrich place "came from a mortgage"; that William had loaned the Goodrichs some money, and, on settlement of the indebtedness Goodrich deeded the property to Charles. Plain-

tiff testified: "At the time the Goodrich deed was taken I cer-
tainly supposed that I was to get a portion of the Goodrich
ranch, because it was the money that we had made together.
. . . . I heard .him [Charles] tell Goodrich that if he would
make the ranch over to him he would pay off the accounts of
the men." He was asked if he knew that the Haskell deed was
taken in Charles' name, "if he didn't feel anxious about having
the Goodrich deed made all right," to which he answered: "No,
no, sir; he told me and I trusted it all to him." Several wit-
nesses testified to the fact that in the general management of
the business of the two places Charles represented that William
was interested and would have to be consulted; such as matters
of sale of grain, insurance, payments of money, etc.

In speaking of the Goodrich deed plaintiff testified: "There
was no understanding or agreement between myself and my
brother as to whose name this deed should be taken in; I did
not know in whose name it was taken in, and never made any
inquiry; my brother said to me, 'All right; Dolan has got the
papers.' He never said anything to me about it or any interest
I claimed in it, and I never asked him for it; the money that
paid for the deed was made on the ranch, and the way I know
this is that he had no other money that I could see, and if he
had other money I might not have known it. I kept my eyes
open to see what my brother was doing generally, but not in the
way of money matters; I left that all to him; when he sold crops
he took the money and put it in the bank and did what he
pleased with it; he did not have to consult me about it."

The defendants introduced the deeds to the property, show-
ing that Charles was the grantee; also the right of way referred
to executed by Charles; also the mortgage of Goodrich to Charles
and its satisfaction by Charles; also deed to certain lands ad-
joining and forming part of the Goodrich place. Defendants
Phillip and Charles Plass, Jr., testified in effect that plaintiff
never, so far as they knew, assumed any control of the prop-
erty, or claimed any interest in it, and in other respects gave
evidence contradictory of plaintiff's evidence. No other wit-
nesses were called by defendants. The will of Charles was in-
troduced by defendants, from which it appears that deceased
devised all his property to his wife Catherine and his brother

William (plaintiff) during their natural lives, and at their death to go to defendants, four-fifths to Philip and one-fifth to Charles. The foregoing is the principal evidence bearing upon the claim of plaintiff to one-third of the Goodrich place.

The evidence, fairly interpreted, indicates that William had some interest in the Goodrich ranch. That interest, however, depends entirely upon the interest he had in the incomes of the Haskell ranch. The evidence as to his interest in that land showed the exact amount of money paid by him toward its purchase, its purchase price, and the precise quantity of his interest. But as to his share or interest in the incomes, out of which it is claimed by him the Goodrich ranch was paid for, there is no evidence whatever, nor is there any evidence as to the quantity of interest William was to have in the Goodrich ranch, nor as to what proportion of the incomes used in its purchase he was entitled to. There never was any accounting between the brothers, and William had no knowledge and gave no evidence as to the amount of the incomes, gross or net. We do not think a presumption should be indulged that his interest in the incomes was one-third or any given proportion, and that one-third of the money paid for the Goodrich place belonged to him, in order to help out what the law requires to be made certain and unambiguous and beyond conjecture. His ownership of a one-third interest in the land is not inconsistent with his ownership of a less interest in the income or no interest at all. The brothers lived together under the same roof and contributed their labor, but Charles was evidently the managing man, and was possessed of the superior ability to conduct the business. Their relation must have been the subject of some agreement as to the division of the proceeds of the ranch, and the terms of that agreement ought not to be left entirely to presumption. Where the tenant out of possession sues the tenant in possession for rents, issues, and profits, it is essential to be averred that the latter occupied the premises upon an agreement with the former as receiver or bailiff of his share of the rents and profits. It is essential to recovery that this circumstance exist. (*Pico v. Columbet,* 12 Cal. 414; 73 Am. Dec. 550; *Howard v. Throckmorton,* 59 Cal. 79.)

If the incomes had been received by Charles as rentals paid by third persons while William was out of possession, he would

have had a claim, and the law would presume his interest to be commensurate with his interest in the land. But we do not think this rule as to presumptions would apply, where the two were engaged in producing the crops, in an action to establish a resulting trust. It was as much the duty of William to prove his interest in the incomes as in the land, inasmuch as he claims an interest in the Goodrich ranch because of his ownership of part of the incomes. If this were an accounting for the incomes, we do not think he could rest alone upon the presumption of his ownership. In a case such as we have here, neither his joint ownership in the lands nor his joint possession, nor both together can give rise to the presumption that he owned one-third of the incomes. The rule under which resulting trusts are created has its origin in the natural presumption that he who supplies the money means the purchase to be for his own benefit rather than that of another; and, it has been held that the burden of proof rests upon the nominal purchaser to show that the party from whom the consideration moved did not mean the purchase to be in trust for himself, but a gift to a stranger. (*Dudley v. Bosworth*, 10 Humph. 9; 51 Am. Dec. 690; Perry on Trusts, sec. 139.) But this presumption cannot aid or produce the presumption that the money belonged to and was furnished by the person claiming as *cestui*. He must first prove that the money was his and was used to make the purchase. And the burden of proof on the whole case rests on the one who seeks to establish a resulting trust to show by clear evidence the necessary facts. (Perry on Trusts, sec. 139; *Johnson v. Quarles*, 46 Mo. 423; approved in *Philpot v. Penn*, 91 Mo. 44.)

The evidence discloses no relationship as partners in the incomes, for there was no evidence of an agreement to share the profits of the business, from which is implied also an agreement to share losses. (Civ. Code, secs. 2395, 2404.) Plaintiff testified that Charles could do what he pleased with the money, and did not have to consult him about it. But if William was entitled to some part of the incomes, either as cotenant or partner, and the Goodrich ranch was purchased from these incomes, that property would, at most, belong to each in the proportion they held their interests in the incomes—it would be income in a new form. But until there was an accounting it

would not be possible to ascertain the interest of William in that
ranch.

William testified that they made money each year on the Has-
kell ranch, and that the Goodrich ranch was purchased with
money "from the Haskell ranch where it was made," but, as no
accounting was ever had between the brothers, it is pure con-
jecture that of the earnings of the Haskell ranch, which went to
purchase the Goodrich place, William was entitled to one-third
on an accounting, or any particular proportion; and it is also
conjecture that he was to have a one-third interest in this pur-
chase.   One witness testified that he heard Charles say that Wil-
liam had a third interest in the Goodrich place, but that is not
enough to establish a resulting trust as against the deed to
Charles where the beneficiary of the trust cannot, or at least
does not, testify, when called as a witness, to any such interest.
His interest in the Goodrich place must necessarily depend upon
facts as yet unascertained.   To infer from this evidence that he
had a one-third interest in these incomes, and that his one-third
interest would on an accounting amount to one-third the cost
of the Goodrich place, would do violence to the principles gov-
erning resulting trusts heretofore laid down by this court in
*Woodside v. Hewel, supra,* and the cases there cited.   The court
there said: "It is a familiar rule that it is incumbent upon him
who would claim that a trust exists in his favor to establish the
fact by clear, convincing, and unambiguous testimony; that the
presumption that the person in whose name the legal title to
land is vested is the absolute owner thereof is not to be over-
come by surmise or conjecture, or by any evidence that fails to
afford satisfactory proof of the fact to the tribunal before which
it is presented; . . . . and that if he would claim an interest
*pro tanto* according to the proportion of the consideration fur-
nished by him, he must show the precise amount paid by him,
as well as the amount for which the purchase was made, in order
that the court may determine the respective rights of the parties
in the property purchased.   The presumption of ownership aris-
ing from the legal title will not be overcome unless the interest
of the claimant can be determined; and the testimony presented
in support of the equitable claim must clearly show not only the
existence of the trust, but also the extent to which the property

is held in trust; otherwise the legal title will prevail." Tested by these principles, we do not think that plaintiff has sufficiently established a trust in his favor as to the Goodrich ranch.

There is no breach of trust or fraud alleged. Plaintiff knew of the investment and consented to it. No question of bad faith arises. It is clearly the case of an investment of funds which, if held and invested by Charles for the benefit of both himself and William, it must have been upon some mutual agreement, the terms of which were certain and definite, and should not be left to mere conjecture or implication. And yet there is no evidence of any agreement, and the most that William testified to is, "at the time the Goodrich deed was taken I certainly supposed that I was to get a portion of the Goodrich ranch, because it was the money that we had made together." But he testified to no portion, nor to any definite interest in the purchase money.

It was said in *Baker v. Vining,* 30 Me. 121, 50 Am. Dec. 617: "No case has been found where a resulting trust has been held to arise upon payments made in common, by the one asserting his claim and the grantee in the deed, wherein the grantor acknowledges the receipt of the consideration from him alone, when the amount belonging to one and the other is uncertain and unknown even to those who make the payments; and no satisfactory evidence is offered exhibiting the portion which was really the property of each. The trust springs from a presumption of law, because the alleged *cestui que trust* has paid the money. Such presumption must be attended with no uncertainty. The whole foundation is the payment, and this must be clearly established." Assuming that the payment here was out of the common funds, there is lacking the essential element of proof as to plaintiff's interest therein.

It must not be overlooked that plaintiff made no claim for many years after his rights accrued, and not until after his brother's death; and, although his laches alone did not bar his claim, as we shall presently show, this fact should make the court more cautious in scrutinizing the evidence, and furnishes strong ground for applying the rule that all the elements of the trust should be clearly proved.

2. It is contended that plaintiff is barred by his own laches. (Citing 1 Perry on Trusts, sec. 141; *Harris v. Hillegass,* 66 Cal.

79; *Bell v. Hudson,* 73 Cal. 285; 2 Am. St. Rep. 791; *Speidel v. Henrici,* 120 U. S. 377; *Douglass v. Douglass,* 72 Mich. 86.)

*Harris v. Hillegass, supra,* was a suit for an accounting of the affairs of a partnership which had been dissolved twenty years prior to the commencement of the suit. *Bell v. Hudson, supra,* was a similar action brought twenty-six years after the death of one of the partners by the administrator of his estate. *Speidel v. Henrici, supra,* was a suit to enforce a trust, and was brought fifty years after plaintiff's rights, if he had any, had accrued, during all which time he took no steps to follow up his rights, or to demand an account of the trustees. *Douglass v. Douglass, supra,* was an action to set aside certain deeds, one of which was made twenty-seven years and the other thirty years prior to the commencement of the action, and of the facts upon which the complainant relied she had full knowledge for more than twenty years.

It is undoubtedly true that courts of equity uniformly decline to assist a person who has slept upon his rights, and shows no excuse for his laches in asserting them. Where conscience, good faith, and reasonable diligence are wanting, the court is passive and does nothing, and its equitable powers will not be called forth into activity. But we have no such case here. Speaking of the statute of limitation, Mr. Justice Temple said in *Love v. Watkins,* 40 Cal. 547, 6 Am. Rep. 624: "I have never yet met with a case, whatever the character of the trust, where the statute has been held to bar the rights of the beneficiary in favor of the trustee, when the beneficiary has continued in possession according to his right, and no adverse claim made by the trustee. Such a case would be at variance with the fundamental idea of statutes of limitation that possession draws to it, or rather extinguishes, all adverse claims and titles." What is here said is equally true where, under like circumstances, the rights of the beneficiary are sought to be barred by his laches. And I understand the rule to be that laches cannot be invoked to defeat a resulting trust in favor of one who has been in continuous and undisputed possession of the property in which it is sought to establish a trust, or is in joint possession with the trustee—the latter admitting the rights of the beneficiary. Neglect to assert his rights for a long period of time while in joint possession with

the trustee may be evidence tending to show that the beneficiary has no rights, but such neglect cannot of itself constitute a bar. So long as the rights of the *cestui que trust* are admitted, laches cannot be set up.

Appellant cites 1 Perry on Trusts, section 141, quoting: "Courts will not enforce a resulting trust after a great lapse of time, or laches on the part of the supposed *cestui que trust,* especially when it appears that the supposed nominal purchaser has occupied and enjoyed the estate." It is, however, stated in the same section by the learned author that "if the trust is admitted, and there has been no adverse holding, lapse of time is no bar"; and, again: "Any excuse for delay that takes hold of the conscience of the chancellor and makes it inequitable to interpose the bar is sufficient." (See cases there cited.) The facts in this case make the rule relied upon by appellants inapplicable.

3. It is claimed that the court erred in its rulings at the trial. But two assignments are urged. One relates to the exclusion by the court upon the offer of defendants of a deed made to Charles Plass by one Easterby to certain lots in the city of Napa, in 1868, after the purchase of the property in question. Plaintiff makes no claim to any interest in these lots. Defendants claimed that this purchase tended to show that Charles was dealing with the incomes of the Haskell and Goodrich ranches as his separate property, thus rebutting the claim that these incomes were the joint property of Charles and William; and also tending to rebut the claim of William that Charles always consulted him about his business affairs, while of this one William admitted entire ignorance. It seems to me that this evidence should have been admitted, but at the same time it was so light in weight and inconsequential in character that a reversal should not be ordered because of its rejection.

The other ruling complained of related to a question put by plaintiff to the witness Phillip Plass for defendants, for the purpose of laying the ground for impeachment. The objection now is, that the question did not embody in it the names of the persons present at the alleged conversation. The question was whether or not the witness did not directly, after his father's death, at Ingall's store, in Napa, in the evening, "have the following conversation with T. R. Parker, to wit"; then follows the

conversation. No names of persons present other than that of Parker are given, and his name only by implication as the person to whom the witness addressed himself. The court, upon objection being made, said if any other persons were present the question would be refused, and it appearing there were none others it was admitted. The point would seem to be whether, when no other persons than the witness and the person to whom he addresses himself are present, is it necessary to state in the impeaching question "no other persons being present," or some equivalent; and is it necessary to name this person to whom the witness has spoken "as being present?" We do not think the rule given in section 2052 of the Code of Civil Procedure requires more than that the statements must be related to the witness, "with the circumstances of times, places, and *persons present*," and this does not mean that counsel must state negatively that no other persons were present. We think, also, that where only the two are present it is quite superfluous to require a statement that the person spoken to was present. Presumably he was present or he could not have been spoken to. Much the same point was decided in *People v. Bosquet,* 116 Cal. 75.

We do not think the evidence sufficient to support the judgment that a resulting trust was created in favor of plaintiff to an undivided one-third interest in the so-called Goodrich ranch, and for that reason the judgment, so far as it relates to the real property known as the Goodrich ranch, should be reversed and a new trial ordered; and as to the other real property known as the Haskell ranch the judgment relating thereto should be affirmed.

For the reasons given in the foregoing opinion the judgment appealed from, so far as it relates to the lands described in the complaint and known as the Haskell ranch, is affirmed, including judgment for costs; and so far as it relates to the lands described in the complaint, and known as the Goodrich ranch, the judgment is reversed, and as to the latter lands a new trial is ordered, such trial to be had upon the evidence already taken and such other evidence as may be presented by either party.

Henshaw, J., Temple, J., McFarland, J.

Hearing in Bank denied.