[L. A. No. 13559. In Bank.—November 29, 1935.]

DABNEY–JOHNSTON OIL CORPORATION (a Corporation), Appellant, v. E. A. WALDEN et al., Respondents.

Lawler & Degnan, Robert M. Pease and Roy P. Dolley for Appellant.

R. F. Bailey, Eugene C. Campbell, A. E. Garten, G. M. Spicer, W. O. Wanzer, Meserve, Mumper, Hughes & Robertson and Hewlings Mumper for Respondents.

SEAWELL, J. — Plaintiff Dabney-Johnston Oil Corporation brought this action to quiet title to real property in the county of Los Angeles. Plaintiff's predecessor in the ownership of said land made assignments of oil royalties under which defendants claim a total of 26½ per cent of all oil, gas and other hydrocarbon substances produced from said real property by plaintiff. To quiet its title against these claims plaintiff brought the action herein. . The well on the property commenced production after institution of the action herein. Pursuant to stipulation of the parties the court took an accounting of the production and proceeds from the sale thereof. From a judgment for defendants, plaintiff prosecutes this appeal.

The assignments under which defendants claim were executed in December, 1922, and in 1923 by Burton Benwell, then owner of the fee in the land. At the time of execution of said assignments the land was subject to an oil and gas lease providing for payment of royalty to the lessor. The lessees assigned said lease to one Noonan, who commenced drilling a well. In December, 1923, the derrick and equipment were destroyed by fire, and the lessee abandoned the leasehold. Thereafter no operations for the production of oil took place on said property until about July 7, 1928, when plaintiff commenced drilling a well. This well commenced production on December 27, 1928, and at the time of the action herein was producing oil in paying quantities. Benwell and wife, on June 23, 1927, by grant deed transferred the real property to Cecil S. Blinn and Ethel G. Blinn. Plaintiff Dabney-Johnston Oil Corporation has succeeded to the title of the Blinns through mesne conveyances. It contends that the assignments of oil royalties made by Benwell, under which defendants claim, transferred only interests in oil royalty due from the lessee under the lease which existed when said assignments were made, and that with the abandonment and forfeiture of said lease, all rights of defendants in oil to be produced from the land terminated. Plaintiff further contends that if the rights of the assignees survived the termination of said lease, in any event the court below committed error in refusing to charge the interests of said assignees with a proportion of the expenses incurred by plaintiff in developing the well and producing oil.

This appeal involves a construction of the royalty assignments under which defendants claim, as reformed by the court to conform to the mutual understanding of assignors and assignees. In making the assignments under which defendants claim, four different forms were used, designated in the briefs as the Donovan form, the Walden form, the Heiderman form and the Hite form. The Donovan form was used in making a ten per cent assignment to J. B. Donovan and a one per cent assignment to J. K. Thompson. Said form is as follows:

"Assignment

"Whereas, on the 14th day of November, 1922, Burton Benwell, leased to H. H. Hitchcock and W. T. Casteel the following described lands:

"Lots Twelve (12), Thirteen (13), Fourteen (14) and Seventeen (17) of Atlantic Boulevard Tract No. 3, in the County of Los Angeles, State of California, as per map recorded in Book 11, page 92 of Maps, Records of Los Angeles County, California.

"And Whereas, said lease is what is commonly known and understood to be an Oil and Gas Lease and

"Whereas, said lease provides that the lessees shall pay, or cause to be paid, to the lessor, as rental or royalty for the use of said lands, thirty per cent (30%) of all oil, gas or other hydrocarbon substances of value discovered, produced and saved by the lessees from said described lands; and

"Whereas, according to the terms of said lease the said lessor is entitled to take and receive thirty per cent (30%) of all oil, gas and other hydrocarbon substances of value discovered, produced and saved by the lessees from said premises; and

"Whereas, the said Burton Benwell desires to sell, transfer, set over and convey unto J. B. Donovan ten per cent (10%) of all oil, gas and other hydrocarbon substances produced and saved from said described lands;

"Now, Therefore, Burton Benwell, for and in consideration of the sum of Ten Dollars ($10.00) lawful money of the United States of America, to him in hand paid by J. B. Donovan, the receipt whereof is hereby acknowledged, does hereby sell, assign, transfer, set over and convey unto the said J. B. Donovan ten per cent (10%) of all oil, gas and other hydrocarbon substances which may hereafter be produced and saved from said described real property.

"To Have and to Hold the same unto the said J. B. Donovan, his heirs and assigns.

"That the said J. B. Donovan, his beneficiaries, heirs, executors, administrators and assigns shall be, and are hereby entitled to take and receive said ten per cent (10%) of all oil, gas and other hydrocarbon substances which may be produced and saved from said described lands during and for so long as said lands shall be used for the purpose of developing and producing oil, gas and other hydrocarbon substances, and until said land shall be abandoned as a producer of oil, gas and other hydrocarbon substances.

"That this assignment shall be and constitute sufficient authority unto the purchaser or purchasers, of the oil, gas and

other hydrocarbon substances produced and saved from said premises to pay direct to the said J. B. Donovan, or to his beneficiaries, heirs, executors, administrators or assigns, the money proceeds derived from the sale of said ten per cent (10%) of all oil, gas and other hydrocarbon substances produced and saved from said described premises.''

The Donovan and Thompson assignments refer to a lease dated November 14, 1922, reserving a 30 per cent royalty. This lease was cancelled and a lease dated January 19, 1923, and providing for a 27½ per cent royalty was substituted therefor. The Walden, Heiderman and Hite forms refer to this later lease.

The Walden form is as follows:

''Assignment of Land Owners Royalty Interest

''Whereas, Burton Benwell and Maude F. Benwell, being owners of that certain parcel, lot or tract of land particularly described as follows, to-wit:

''Lots Twelve (12), Thirteen (13), Fourteen (14) and Seventeen (17) of the Atlantic Boulevard Tract #3, partly within and partly without the City of Long Beach, County of Los Angeles, State of California, as per map recorded in Book 11, Page 92 of Maps, in the office of the Recorder of said County.

''Whereas, said Burton Benwell and Maude F. Benwell reserved a certain twenty-seven and one-half per cent (27½%) royalty in a certain lease dated January 19th, 1923, from Burton Benwell and Maude F. Benwell to W. T. Casteel and H. H. Hitchcock on the above described real estate, subject to the terms and conditions provided for in said lease, recorded January 22nd, 1923, in Book 1750, Page 220 of Official Records.

''Whereas, the said Burton Benwell and Maude F. Benwell desire to sell a portion of the said 27½% land owners royalty as reserved in said lease;

''Now, Therefore, in consideration of the sum of $10.00 to them in hand paid, receipt of which is hereby acknowledged, the said Burton Benwell and Maude F. Benwell do hereby sell, assign and set over to E. A. Walden whose address is 35 American Avenue Street, Long Beach City, California State, a two per cent in said land owners royalty of all gas, oil and other hydrocarbon substances to be produced and saved and sold from said described land, together with all of the rights

and privileges granted to said Burton Benwell and Maude F. Benwell, in that certain lease above set out.

"Acceptance

"I accept the above assignment; and it is further understood, and I, the purchaser of two per cent land owners royalty in the said described real estate, do hereby appoint L. W. Klinker, of the Guaranty Title Company of Long Beach, as Trustee, and Escrow Officer for me, to receive and disburse any and all oil or gas profits or dividends to be derived from that certain land above described and hereby instruct him to sign any sale orders or other papers necessary that may be required when oil is being sold from the above premises."

The Heiderman form, used only for the assignment of a one per cent interest to Heiderman, differs from the Walden form only in that the acceptance, as quoted above, is not annexed to the Heiderman form. The Hite form, used in five assignments transferring a total of two and one-half per cent, is the same as the Walden form, except that the Hite form contains the following recital: "Whereas, the said Burton Benwell and Maude F. Benwell desire to sell a portion of said 27½ per cent land owners royalty as reserved in said lease, *or any subsequent lease.*" (Italics supplied.) The words, "or any subsequent lease", are omitted in the corresponding recital in the Walden form.

Some of the defendants herein are not original assignees of Benwell, but purchasers from such assignees. The subsequent transfers did not in all cases follow the form of the original assignments. But the court below found, in accordance with the stipulation of the parties, that as to all reassignments it was the intent of the assignors to transfer whatever interest passed to them under the assignments from the Benwells. The plaintiff named as defendants all original transferees of interests from Benwell, as well as the present holders of such interests, and such defendants either defaulted, filed disclaimers, or answered in cases where they had retained a portion of the interest assigned to them by the Benwells.

We have hitherto referred to the fact that the court below by its decree reformed the royalty assignments from Benwell and wife to conform to the understanding of assignors and assignees. The parties to the action herein entered into a

stipulation of facts concerning this intent, and further stipulated that the defendants should be deemed to have filed a cross-complaint alleging as grounds for reformation the facts as to mutual intent set forth in the stipulation of facts. By said stipulation of facts it was provided that it was the intent of the Benwells, assignors, to transfer "the fractional part or percentage shown in each such instrument of all oil, gas and other hydrocarbon substances *in place* and/or existing *within* or *beneath* the surface of said land, as a *permanent fractional interest in* said land", and to transfer "the fractional part or percentage shown in each of said instruments of all oil, gas and other hydrocarbon substances which thereafter might be produced, served and sold from said land"; that it was not the intention of the assignors nor assignees to restrict the interests to the taking of a percentage of oil and other substances produced under either of the leases to Hitchcock and Casteel, but said assignments were intended by all parties to be "a grant and conveyance of an interest in real property, and a right to and interest in said percentage of oil, which right, interest and property was unconditional, permanent and independent of all contingencies".

█ The court below made findings and conclusions of law in accord with this stipulation, and directed reformation of the assignments by addition of a clause following the language of said stipulation. The stipulation did not cover the question of whether plaintiff Dabney-Johnston Oil Corporation had notice of the intent of the parties to the Benwell assignments to create permanent oil interests. Unless plaintiff had such notice or was charged with notice, a reformation could not be had as against it. There is an abundance of evidence, both oral and documentary, which supports the court's finding that plaintiff was not a *bona fide* purchaser.

Benwell and wife transferred the property to Cecil S. Blinn and wife by grant deed on June 23, 1927. On November 19, 1927, the Blinns executed an oil and gas lease to Joseph B. Dabney as lessee. No operations were had under this lease, but on January 3, 1928, Blinn and wife executed a quitclaim deed of the property to South Basin Oil Company. Joseph B. Dabney was the sole stockholder, president and manager of the South Basin Oil Company. By deed dated February 3, 1928, and recorded March 5, 1928, the property was transferred by the South Basin Oil Company to Joseph B. Dabney

and wife, who by deed dated January 1, 1928, and recorded April 17, 1928, transferred it to plaintiff herein, Dabney-Johnston Oil Corporation. Joseph B. Dabney is the majority stockholder, the president and the manager of plaintiff corporation. Notice to him was notice to the South Basin Oil Company and to plaintiff Dabney-Johnston Oil Corporation.

The royalty assignments made by Benwell were all recorded. Blinn, who had purchased the property three and a half years after abandonment of the Hitchcock-Casteel lease, had actual knowledge at all times of the situation pertaining to Benwell's assignments. He knew of claims being made by the assignees that their rights survived the termination of the lease, and after his purchase he had a conference with assignee Walden, acting for the other assignees, but they were unable to reach an agreement for operation of the property. Blinn testified that before the property was leased or granted to Dabney or the South Basin Oil Company, he gave Mr. Dabney full information as to the claims being made by the assignees. He also gave this information to Mr. Pease, who acted as Mr. Dabney's attorney in these transactions. Mr. Pease wrote Blinn a letter on November 17, 1927, in which he asked him to bring in a title report which Blinn had procured, a form of assignment used by Benwell, and to inform him as to the name of the man ''who had data as to the percentages''. This reference is to Mr. Walden, whom Blinn brought to see Pease and Dabney· before the transfer of the property to the South Basin Oil Company. The title certificate or report set forth the royalty assignments. It was stipulated that at or before the execution of the deed to South Basin Oil Company, Joseph B. Dabney had before him and examined and knew the contents of said title report.

The terms of a contract of November 19, 1927, which was entered into contemporaneously with the lease from the Blinns to Dabney, are significant. By said contract Dabney agreed to clear the title of said royalty interests, Blinn to cooperate but to be at no expense. If title had not been cleared in ninety days, Blinn was to have the right to require Dabney to assign to parties holding said interests overriding royalties under the lease of November 19, 1927, in consideration for the cancellation of their interests under the Benwell assignments, provided that no more than $6\frac{2}{3}$ per cent overriding royalties should be used to procure such cancellation. Blinn testified

that the royalty under the lease from him to Dabney was fixed at the low figure of ten per cent because of these outstanding interests. Ten per cent, plus 6⅔ per cent, which the parties considered would be sufficient to secure a surrender of the outstanding landowners' royalties, is 16⅔ per cent, at which figure oil lands are frequently leased. When Dabney determined to purchase the land in the name of the South Basin Oil Company, the Benwell assignments were taken into consideration in fixing the purchase price. The contract of November 19, 1927, provided that it should not be recorded, and the lease of the same date was not recorded, but only a notice of said lease was placed of record. The contract also referred to an action brought by Blinn on November 4, 1927, to quiet his title against claims of the Benwell assignees to permanent oil rights. Because of the claims of these assignees, Blinn insisted that the lease contain this provision: "Lessors do not warrant title to said real property in any way."

The Dabney-Johnston Oil Corporation did not commence to drill a well until about July, 1928. In May, 1928, it had written to the royalty assignees that on the advice of its counsel it considered its title free of their interests by reason of the termination of the Hitchcock lease and the abandonment of the well drilled under said lease. ▪ The conclusion is inescapable that Dabney and the corporations which he represented acquired their interests with full knowledge that the royalty assignees claimed permanent interests in all oil and gas produced from the land. In this situation the reformation of said assignments more completely to express the intent of the parties thereto is binding on plaintiff Dabney-Johnston Oil Corporation.

▪ As noted above, the instruments as reformed convey the stated percentage of oil, gas and other hydrocarbon substances in place, and existing within and beneath the lands described, as a permanent fractional interest in the land. Plaintiff contends that by reason of the fact that we have rejected the oil and gas in place theory as applied to oil rights, the instruments as reformed will not support the judgment for defendants. Our recent decision in *Callahan* v. *Martin,* 3 Cal. (2d) 110 [43 Pac. (2d) 788], contains a discussion of this theory at page 115. The use of "oil and gas in place" terminology, which describes an unlimited grant of oil rights

as a present transfer of a fee in definite corporeal real property is anomalous. It fails to take into account the fugacious and vagrant nature of oil and other hydrocarbon substances. Oil actually brought to the surface to which the grantee's right attaches may be not only the oil and gas in place beneath the surface of the assignor's land at the time of the assignment, but also oil drawn from beneath the surface of other lands. In our decision in *Callahan* v. *Martin* we reject the oil and gas in place doctrine, as have many other courts, including the Supreme Court of the United States (*Ohio Oil Co.* v. *Indiana,* 177 U. S. 190 [20 Sup. Ct. 576, 44 L. Ed. 729]), but we find that nevertheless oil rights may be recognized and transferred as interests in real property on other theories which give due recognition to the fugacious character of the substances involved.

The owner of land has the exclusive right on his land to drill for and produce oil. This right inhering in the owner by virtue of his title to the land is a valuable right which he may transfer. The right when granted is a profit *a prendre,* a right to remove a part of the substance of the land. A profit *a prendre* is an interest in real property in the nature of an incorporeal hereditament. (*Callahan* v. *Martin, supra.*) Under the usual oil and gas lease the owner confers on the lessee for the term of the lease an exclusive right of profit to drill for and produce oil, the lessee usually returning to the lessor for the privilege granted a rent or royalty measured by a fraction of the oil produced. Or the owner may grant rights which make the grantees cotenants with him and with each other in the right to drill for and produce oil and other hydrocarbon substances.

The profit *a prendre,* whether it is unlimited as to duration or limited to a term of years, is an estate in real property. If it is for a term of years, it is a chattel real, which is nevertheless an estate in real property, although not real property, or real estate. (*Callahan* v. *Martin, supra,* pp. 506, 507.) Where it is unlimited in duration, it is a freehold interest, an estate in fee, and real property or real estate. Thus, although the oil and gas in place doctrine is rejected, interests in oil rights which are estates in real property may be granted separate and apart from a grant of surface title. The grantee of the profit has a right to such possession of the surface as is

necessary and convenient for the exercise of the profit, but he has no general estate in the surface.

In the instant case the instruments as reformed to accord with the intention of the parties purport to grant percentages in oil and gas in place and existing within and beneath the land. Whether an assignment of the right to drill for and produce oil is characterized as a grant of oil and gas in place, or as a grant of a profit *a prendre*, where it is unlimited in duration it has been described by judges and by textwriters as a deed of the mineral fee. Although the use of different terms of description may give rise to different legal incidents, as to many particulars the legal consequences are the same, whichever theory is adopted in a particular jurisdiction. Where it is plain, as it is from the terms of the instruments as reformed in the case herein, that the instruments were intended as deeds to the mineral fee, they should not be held to be inoperative because oil and gas in place terminology has been used in a jurisdiction which rejects that analysis of rights in oil and gas. The instruments as reformed also provide that they are intended as a conveyance of an interest in real property, "which right, interest and property is unconditioned, permanent and independent of all contingencies".

Where it is apparent from the instrument as a whole that a deed of the mineral fee is intended, which in this state is a right of profit *a prendre*, it is not essential that it contain express provision for a right of entry to drill for and produce oil. One who grants a thing is presumed to grant also whatever is essential to its use. The right of entry is incident to the grant of the mineral fee, and exists without express mention in like manner as certain rights follow without express enumeration, from an ordinary deed absolute of real property. (*Callahan* v. *Martin, supra.*) In the cited case we reject the distinction made by the Oklahoma court in *Morgan* v. *McGee*, 117 Okl. 212 [245 Pac. 888], that upon a conveyance of land, reserving mineral rights, a right of entry will be implied in favor of the grantor, but upon a transfer of mineral rights by a grantor who reserves the surface estate, a right of entry will not be implied in favor of his grantee.

The failure of those who are dealing in oil rights to precisely describe the nature of the interests granted is due in part to the recent development of the oil industry. The law

pertaining thereto is still in a formative stage. An analysis of the nature of oil interests which may be created involves an application of the common-law rules which crystallized before there were extensive dealings in subsurface fugacious substances. In the several jurisdictions in this country there is a contrariety of description as to the nature of these interests, and in a single jurisdiction, as in this state, there are conflicting expressions as to the description of oil interests. (See *Callahan v. Martin, supra.*) It is not surprising, in view of the lack of a definite terminology descriptive of these interests, that those who are dealing in oil interests have difficulty in describing the interest transferred, and that ambiguous and uncertain instruments are presented to the courts for analysis. Such instruments must be construed as a whole in the light of the circumstances under which they were executed and the expressed intent of the parties at that time. In the instant case the court reformed the assignments by adding a clause to express more clearly the intent of the assignors and assignees, as to which there was a stipulation, to transfer an interest in real property, which should be unconditional, permanent and independent of all contingencies.

At the time of execution of the several assignments, the land was subject to an oil and gas lease, which conferred on the lessees the exclusive right to drill for oil during the term of the lease, returning to the lessors a stated percentage of the oil produced. The royalty return which the lessee renders to his lessor is a rent. The right to receive future rents and oil royalties is an incorporeal hereditament, which is an interest in land, and may be the subject of a grant. (*Callahan v. Martin, supra;* sec. 802, subd. 4, Civ. Code.) In addition to the right to receive rent or royalty, the lessor has a reversionary interest in the right to drill for and produce oil, dependent upon the termination of the existing leasehold, which right is the subject of grant. It is appellant's contention that the instruments as written present a clear and unambiguous assignment limited to fractional interests in rental or royalties to accrue under the existing lease, or in the case of the assignments which follow the Hite form, limited to royalties to accrue under the existing lease or under subsequent leases, and that as appellant

is not a lessee, but an owner of the land, defendants have no rights in oil produced by it as such owner.

The Donovan form is clearly not subject to a construction limiting the assignee's rights to oil produced under the lease in existence at the time of the assignment. It provided as follows: "That the said J. B. Donovan, his beneficiaries, heirs, executors, administrators and assigns shall be, and are hereby entitled to take and receive said ten per cent (10%) of all oil, gas and other hydrocarbon substances which may be produced and saved from said described lands *during and for so long as said lands shall be used for the purpose of developing and producing oil*, gas and other hydrocarbon substances, and until said land shall be abandoned as a producer of oil, gas and other hydrocarbon substances." The land is now being used "for the purpose of developing and producing" oil and gas. The reference in this assignment to the oil lease does not limit the grant to oil royalties produced under said lease, but makes the interest granted to Donovan subject to the lease, and indicates the intent of the assignor to transfer an interest in royalties under said lease, as well as an interest in the reversionary rights dependent on the termination of said lease. As noted above, the Walden and Heiderman forms are identical, except that the Heiderman form omits an acceptance of the assignment by the assignee. The granting clause in these assignments, and also in the Hite form, is as follows: "Now, therefore, in consideration of the sum of $10.00 to them in hand paid, receipt of which is hereby acknowledged, the said Burton Benwell and Maude F. Benwell do hereby sell, assign and set over to —— whose address is ——, a —— per cent in said land owners royalty of all gas, oil and other hydrocarbon substances to be produced and saved and sold from said described land, together with all of the rights and privileges granted to said Burton Benwell and Maude F. Benwell in that certain lease above set out."

The Walden and Heiderman forms set forth the existence of the lease and contain this recital: "Whereas the said Burton Benwell and Maude F. Benwell desire to sell a portion of said 27½% landowners royalty as reserved in said lease." The Hite form differs from the Walden and Heiderman forms in that the recital is as follows: "Whereas the said Burton Benwell and Maude F. Benwell desire to sell a portion of said 27½% land owners royalty as reserved in said lease

*or any subsequent lease.''* (Italics supplied.) This recital is a clear statement of intent that the rights of assignees holding under the Hite form should survive the existing lease. As to the assignees holding under the Walden and Heiderman forms, as well as those holding under the Donovan and Hite forms, the court, in decreeing that the instruments be reformed by adding a clause thereto, found, in accordance with the stipulation of the parties, that it was the intent of assignors and assignees to create permanent oil rights which were not dependent on the continuance of the existing lease or the making of a new lease, but were unconditional, permanent, and independent of all contingencies. In making this finding the court considered not only the stipulation, but the abundance of evidence offered to show that the term ''landowner's royalty'', unless clearly and unequivocally limited to royalty payable under a particular lease, was generally regarded in southern California as an unlimited, permanent interest, in contrast with interests created by lessees, which by necessity must fall with the lease. The Walden, Heiderman and Hite forms are all entitled ''Assignments of Land Owners Royalty Interest.'' The assignee's acceptance attached to the Walden and Hite forms describes the assignee as ''a purchaser of —— per cent landowners royalty in said described real estate'', without limiting it to oil produced under the existing lease.

Language of a grant is to be construed most strongly against the grantor. An assignment of oil royalty limited to a particular lease is precarious. Not only may the assignee's rights be terminated where the lessee wrongfully abandons the lease, but oil leases frequently contain rather broad provisions giving the lessee the right to terminate lawfully in specified contingencies. An intent to thus limit the rights of the assignee should be clearly and unequivocally indicated. In the instant case the presence of the term ''landowner's royalty'' in the title and body of the instruments, the form of the acceptance, and the circumstance that the granting clause does not expressly limit the interest conveyed to the duration of the existing lease, may be sufficient to create an ambiguity as to whether it was intended to limit the interest to the duration of the lease which could be resolved by parol evidence of the circumstances attending the execution of the instruments without reference to principles of reformation of contracts. However this may be, the court decreed reformation

in the case herein, upon the stipulation of the parties that defendants should be deemed to have filed a cross-complaint setting forth as grounds for reformation the stipulated facts as to mutual intent of the parties to the instruments to create a permanent interest.

Plaintiff contends that even though the assignments be construed as giving to the assignees rights which survive the existing lease, nevertheless it is of the essential nature of an assignment of oil royalty that it creates rights only in oil produced under lease, an assignment of oil royalty being a transfer of an interest in the rent or royalty returned to the lessor in consideration for privileges granted the lessee. Thus, plaintiff would deprive the Benwell assignees of rights in oil produced by it, since it is not operating under any lease, but has succeeded to the title in fee of Benwell in surface rights and unconveyed oil rights. The term ''oil royalty'' has this connotation. (*Callahan* v. *Martin, supra; Standard Oil Co. of California* v. *John P. Mills Organization*, 3 Cal. (2d) 128 [43 Pac. (2d) 797].) But it has a broader meaning, as appears from testimony in the case herein, and is applied generally to assignments of undivided interests in oil to be produced, or in the proceeds from the sale thereof, without regard to whether the oil is produced under lease. There is evidence that J. B. Dabney, president of plaintiff Dabney-Johnston Oil Corporation, himself had caused to be made on his behalf a number of assignments of percentage interests in ''all the oil, gas and/or other hydrocarbon substances produced, saved and sold from, or contained in or under'' described real property in Huntington Beach. These assignments were entitled ''Landowner's Royalty Assignment,'' and made no reference to any lease. The rights of the assignees thereunder clearly were not limited to oil to be produced under lease.

We hold that upon the termination of the Hitchcock-Casteel lease the assignees under the royalty assignments became tenants in common with Benwell in oil rights in the land. Plaintiff Dabney-Johnston Oil Corporation has succeeded to the rights of Benwell. It contends that even though it is a cotenant with the Benwell assignees, as such cotenant it had coequal rights in the mineral estate, and is entitled to all oil produced through its own efforts, and that in any event, if it must account to defendants, the sums payable are subject to

a proportionate reduction on account of expenses incurred by plaintiff in drilling the well and producing oil. The court below held that defendants' interests were in the gross amount of oil and other substances produced, and in the gross proceeds from the sale thereof, without deduction for drilling or maintenance costs. The court made certain deductions on account of city and county taxes assessed against the mineral rights and on account of an assessment levied by the state of California for the oil protection fund, and paid by plaintiff, which taxes were on the interests of defendants. They make no objection to these deductions.

 The rights of those who are tenants in common in oil rights in land are the subject of annotation in 40 A. L. R. 1400, note appended to *Prairie Oil & Gas Co.* v. *Allen,* 2 Fed. (2d) 566 [40 A. L. R. 1389], and 91 A. L. R. 205, note appended to *Earp* v. *Mid-Continent Petroleum Corp.,* 167 Okl. 86 [27 Pac. (2d) 855, 91 A. L. R. 188]. It is there pointed out that in some jurisdictions it is waste for one tenant in common to go upon the land and produce oil without the consent of the other cotenants. But the more generally prevailing rule, as announced in the cases to which the notes are appended, is to the effect that a tenant in common has the right to go upon the lands and produce oil, provided he does not exclude other cotenants, but must account to cotenants for their respective percentages. A tenancy in common is characterized by a single unity, that of possession, or of the right to possession. In view of the fact that no enjoyment can be had of an estate in oil rights except through removal of the oil and other substances, it is held that it is not waste for a cotenant to go upon the land and produce oil. This rule has been announced in this state as to minerals which are non-fugacious in *McCord* v. *Oakland Q. M. Co.,* 64 Cal. 134 [27 Pac. 863, 19 Am. Rep. 686]. It is there said at page 142: "The taking of ore from the mine is rather the use than the destruction of the estate—within the meaning of the general rule. The results of the tenant's labor and capital are in the nature of proceeds, or profits, the partial exhaustion being but the incidental consequence of the use." This principle, applicable to minerals in general, is of special importance in regard to fugacious substances, which may be lost entirely through drilling operations on other lands if the owners do not diligently seek to reduce them to possession. A single

cotenant should not be in a position to prevent beneficial utilization of the mineral estate by the other cotenants.

Those jurisdictions which hold that it is not waste for a single cotenant to enter upon the land and produce oil, nevertheless are in accord in their view that the tenant producing must account to the other cotenants for their percentages of the oil produced. In recognizing the right of the nonproducing cotenants to share in the oil produced, the courts may seem to be making a departure from the common law rule relating to ordinary cotenancy in surface rights. As to the ordinary tenancy in common in surface rights, it is the rule that where one of several cotenants has been in sole possession of the land and has produced crops thereon, he is entitled to retain the products of his labor, but where he receives rents from third persons for the use of the land, he must account to his cotenants for their share. (*Pico* v. *Columbet*, 12 Cal. 414 [73 Am. Dec. 550] ; *McWhorter* v. *McWhorter*, 99 Cal. App. 293 [278 Pac. 454] ; *Plass* v. *Plass*, 122 Cal. 3, 11 [54 Pac. 372] ; *Howard* v. *Throckmorton*, 59 Cal. 79 ; *Wood* v. *Henley*, 88 Cal. App. 441 [263 Pac. 870].) The rule permitting nonproducing cotenants to share in oil produced by a single cotenant is justified by the difference in a cotenancy in mineral rights and such a tenancy in the surface estate. This rule has become well established, as indicated in the annotations to which we have referred. The propriety of the principle was recognized by this court in the early case of *McCord* v. *Oakland Q. M. Co., supra*, where the court said, at page 148 : "But it may be conceded, for the purposes of this decision, that the relation of the tenants in common, under the circumstances disclosed, is *sui generis*, and their rights peculiar. That while the extraction of ore from the mine by one tenant, who does not exclude his cotenants, is not waste, and the neglect of the latter to enter should be held an assent on their part to the exclusive occupation by the former; yet, because of the effect of the exclusive working by one may be to exhaust the mineral, and the uncertainty of the prospective value of the property may render it impossible to make a just partition of it, a court of equity should order an accounting; holding that, while it must have been contemplated by the parties that the tenant in occupation should not be held for waste, nor prohibited from proceeding with his work by the cotenants who do not seek to enter, yet it

must also have been contemplated that the tenant in occupation should not appropriate to himself the entire profits.''

That the parties in the instant case did not contemplate that a single producing tenant should retain the entire output is indicated by the stipulation of facts and the reforming clause added to the assignments, which expressly provide that the rights of the assignees extend not only to oil within and beneath the land, but to all oil and other hydrocarbon substances produced and saved from said land, however said substances should be produced.

There can be no question but that under the line of cases which sustains the right of a single cotenant to produce oil, with the duty to account to the nonproducing cotenants for their fractional interests, it is held that the interests of the nonproducing cotenants are generally subject to a charge or deduction for their proportion of drilling and operation expenses. The justice of this charge is apparent in the cases where it has been applied. But where cotenancy interests have been sold with the understanding and agreement that they shall not be subject to such charge, but that other units shall bear the full expense of production, the general rule is controlled by such agreement of the parties, express or necessarily implied. Cotenants who purchase the expense-bearing units with notice, actual or constructive, of the agreement freeing other units from expense are bound thereby. The expense-bearing units must recognize this charge or burden, in like manner as the purchaser of property subject to the burden of a mortgage must recognize the mortgage as a lien on the land.

In the instant case the court found that defendants were entitled to receive their respective percentages of the gross amount of all oil, gas and other substances, and of the gross sum for which such substances were sold, without deduction for expenses. At the time the Benwell assignments were issued the land was subject to an oil lease providing for royalty of $27\frac{1}{2}$ per cent to the lessor. The lessor, under the lease, was entitled to this percentage without deduction for expenses. The remaining $72\frac{1}{2}$ per cent constituted the working interest and bore all expenses during the lease. The royalty assignments transferred fractional interests in this royalty during the term of the lease. Under the instruments the holder of a one per cent assignment was entitled during

the lease to receive this per cent (payable from the lessor's 27½ per cent) without any deduction for expenses incurred in the production of oil. The instruments contain no provision making the percentages subject to expenses in the event of a termination of the lease, and we are of the view that considering the instruments as a whole, in the light of the circumstances under which they were executed, they are not subject to such a deduction. The 72½ per cent remains subject to production expenses, after termination of the lease, as before. The court found that plaintiff succeeded to this 72½ per cent interest with notice that defendants were claiming permanent interests in the gross proceeds without deduction. Upon the evidence the court could have reached no other reasonable conclusion but that the plaintiff had notice of the claims of defendants.

We do not mean to hold that under all circumstances, unless the deeds creating a cotenancy in oil rights expressly make the interests subject to expenses, they are free therefrom. In the instant case the bulk of the defendants own interests of one per cent or less. If said interests, originally small, are reduced by the termination of the lease, there will be little left to the assignees. Of course, the conclusion we here reach does not depend on the size of the interests alone. Doubts as to whether cotenancy interests are subject to charge or free therefrom will generally yield to a construction of the instruments as a whole, considered in the light of the circumstances under which they were executed. The court's finding in the case herein that defendants' interests are not subject to charge must be upheld.

The judgment is affirmed.

Thompson, J., Curtis, J., Langdon, J., and Waste, C. J., concurred.

Rehearing denied.