[Civ. No. 31334. First Dist., Div. Four. Nov. 16, 1973.]

CAL-CUT PIPE & SUPPLY, INC., et al., Plaintiffs and Respondents, v. HARADINE PETROLEUM, INC., et al., Defendants and Appellants.

**COUNSEL**

Cominos, Shostak & Epstein, Eugene Epstein and Theodore H. Cominos for Defendants and Appellants.

Deadrich & Bates and Kenneth H. Bates for Plaintiffs and Respondents.

**OPINION**

**RATTIGAN, J.**—This appeal involves questions of fact and law arising under the Oil and Gas Lien Act, to which we hereinafter refer as the "Act." (Code Civ. Proc., pt. 3, tit. 4, ch. 2.5 [commencing with § 1203.50].) As the Act has not been cited in a reported appellate decision since its enactment in 1959 (Stats. 1959, ch. 2020, § 1, p. 4660 et seq.), some of the issues presented are apparently matters of first impression.

The appeal is from a single judgment entered in two substantially identical actions which were consolidated for trial. Plaintiff Cal-Cut Pipe & Supply, Inc., is a corporation engaged in the oil field supply business; plaintiff Bakersfield Drilling Company, Inc., is an oil-drilling contractor. Each of them commenced an action against "Joe Cannon dba Joe Cannon,

Operator,"[1] Haradine Petroleum, Inc. (a corporation, hereinafter "Haradine"), William P. Steitz, and others, seeking to foreclose a lien claimed pursuant to the Act. After a nonjury trial of the consolidated actions, the trial court filed findings of fact and conclusions of law in plaintiffs' favor and entered judgment sustaining and foreclosing the claimed liens accordingly. Defendants Haradine and Steitz appeal from the judgment.

Plaintiffs claim liens, pursuant to pertinent provisions of the Act,[2] upon an oil and gas leasehold owned by Haradine. In September 1968, Haradine and Cannon entered into a written agreement in which Cannon (1) was granted an option to purchase the leasehold from Haradine and (2) agreed to drill a pilot oil and gas well on the leased land before the terminal date by which the option was to be exercised. In the course of drilling the pilot well as agreed, he contracted with plaintiffs for certain materials and services which they furnished to him on credit and which were used in the drilling operation. Cannon completed the pilot well, but did not exercise the option granted him in his agreement with Haradine.

---

[1] Defendant Cannon, an individual, defaulted in both actions and died before the trial.

[2] Except where otherwise indicated, all statutory references herein are to sections of the Code of Civil Procedure which appear in the Act. The immediately pertinent sections thereof provide as follows:

"1203.51. Unless the context otherwise requires, the definitions set forth in this section shall govern the construction of this chapter [i.e., of the Act].

". . . . . . . . . . . . .

"(b) 'Owner' means a person holding any interest in the legal or equitable title or both to any leasehold for oil or gas purposes, or his agent and shall include purchasers under executory contract, receivers, and trustees."

"1203.52. Any person who shall, under contract with the owner of any leasehold for oil and gas purposes perform any labor or furnish any material or services used or employed, or furnished to be used or employed in the drilling or operating of any oil or gas well upon such leasehold, or in the constructing, putting together, or repairing of any material so used or employed, or furnished to be so used or employed, shall be entitled to a lien under this chapter [i.e., under the Act], whether or not a producing well is obtained and whether or not such material is incorporated in or becomes a part of the completed oil or gas well, for the amount due him for any such labor performed, or materials or services furnished, within six months prior to the date of recording the statement of lien as provided in Section 1203.58 [of the Act], including, without limitation, shipping and mileage charges connected therewith, and interest from the date the same was due."

Section 1203.53 extends such lien to "[t]he leasehold for oil or gas purposes to which the materials or services were furnished, or for which the labor was performed, and the appurtenances thereunto belonging," and, with specified exceptions, certain other property associated with the leasehold.

Other provisions of the Act are cited hereinafter.

Since the liens claimed by plaintiffs are for materials and services furnished under contract with Cannon alone, the validity of the liens depends upon whether his 1968 agreement with Haradine made him an "owner" of the leasehold, at pertinent times, within the meaning of the Act. The trial court determined that it did; we disagree with the court's reasoning, but we affirm the judgment because we concur in the result reached. Our conclusions require a detailed summary of the evidence, which follows.

## The Evidence

The oil and gas leasehold in question is held on approximately 7,000 acres of land which is located in Monterey County and which is owned in fee by one Henry R. Alexander, Jr., and others. The leasehold (hereinafter the "Alexander leasehold") was created in a written "Oil, Gas and Mineral Lease" executed in 1963 (the "Alexander lease"), in which the owners (as "lessor") granted to defendant William P. Steitz (as "Lessee") the right to drill for and extract oil, gas and related substances on the land, with the owners to be paid on a royalty basis for oil and gas removed. The term of the Alexander lease was five years from the date of its execution, plus an indeterminate period of time "thereafter" as provided in its habendum clause.[3]

As the result of successive assignments of the Alexander lease (see fn. 3, *ante*), and subject to an overriding royalty interest reserved by Steitz as the original lessee-assignor, Haradine was the lessee thereunder (and, thus, the owner of the Alexander leasehold) on September 24, 1968. On that date, Haradine and Cannon executed the agreement ("Option To Purchase Oil, Gas And Mineral Lease") which underlies the present

---

[3]Although the provisions of the Alexander lease are not disputed in the present controversy, its habendum clause is relevant. The clause states:

"To HAVE AND TO HOLD the same for a term of 5 years from and after the date hereof and so long thereafter as Lessee shall conduct development (including, without limitation, drilling, redrilling, deepening, repairing and reworking) or producing operations on the leased land without cessation for more than 90 consecutive days, or be excused therefrom as hereinafter provided."

(For a discussion of variations of such habendum clauses as used in the typical California oil and gas lease, see *Dabney* v. *Edwards* (1935) 5 Cal.2d 1, 12 [53 P.2d 962, 103 A.L.R. 822]; *Montana-Fresno Oil Co.* v. *Powell* (1963) 219 Cal. App.2d 653, 659-660 [33 Cal.Rptr. 401]; Hightower, *The Oil and Gas Lease in California* (1956) 3 U.C.L.A. L.Rev. 424, 432-436.)

Another provision of the Alexander lease made it assignable by the lessee, subject to the lessor's consent only under circumstances which are not relevant here.

controversy. Its pertinent provisions are summarized, and quoted as indicated, in the margin.[4]

At the time the 1968 agreement was executed, Steitz recorded a "Notice Of Non-Responsibility For Construction Or Improvements On Land"

[4]Hereinafter, all references to specific provisions of the 1968 option agreement are addressed to this footnote.

The agreement referred to Haradine as "Seller" and to Cannon as "Buyer." They agreed as follows (the indicated editing is by this court):

"ARTICLE I. Seller hereby gives and grants unto Buyer an option to acquire, for the sum of . . . [$350,000] . . . , hereinafter referred to as 'purchase price,' on or before the 24th day of January, 1969, . . . [the Alexander lease] . . . , a copy of which lease is attached hereto, marked 'Exhibit A' and by this reference incorporated herein, which lease has been assigned and is owned by Seller (as is evidenced by two (2) Assignments attached hereto as Exhibits B and C and by this reference incorporated herein, together with five (5) oil wells, one (1) water well, tank farm, and all other facilities and equipment owned by Seller situated on the leased property.

"ARTICLE II. The purchase price is to be paid in the following manner: . . . [$100,000 at the time the option is exercised, the balance to be paid thereafter on specified terms] . . .

"ARTICLE III. This option may be exercised by Buyer by mailing or delivering in person a written notice of acceptance of the offer herein to WILLIAM P. STEITZ at 333 Abbott Street, Salinas, California on or before 12:00 o'clock midnight on January 24, 1969.

". . . . . . . . . . . . .

"ARTICLE V. Buyer agrees to commence, or cause to be commenced, on or before November 3, 1968, operations for the drilling of a well in search of oil or gas, and thereafter to continue the drilling of said well with due diligence and in a workmanlike manner to a depth sufficient to ascertain if oil is existent. In the event that Buyer elects not to exercise this option, HARADINE shall have the right to elect whether or not it will take over, complete and equip the said well for production. If HARADINE elects not to take over the said well, Buyer shall promptly plug and abandon the said well, at the Buyer's sole risk and cost. All operations conducted hereunder by Buyer shall be at Buyer's sole risk, cost and liability, and Buyer agrees to hold Seller harmless therefrom.

"ARTICLE VI. Five (5) days prior to the initiation of any drilling of any well by the Buyer hereinafter, Buyer shall notify Seller of his intention to do so, so that Seller may post a notice of non-responsibility.

". . . . . . . . . . . . .

"ARTICLE X. Seller agrees to operate in a prudent manner from and after the date hereof, and until Buyer elects or rejects the exercise of this option, all wells heretofore drilled on the lands covered by said lease and to maintain each and all of said wells in good repair, all at Seller's sole cost, risk and liability. Seller shall be entitled to all production during the option period.

". . . . . . . . . . . . .

"ARTICLE XIV. Seller agrees to pay to Buyer all gross income received by Seller from the sale of oil and gas produced and saved from any wells located on the lands subject hereto from and after date of the exercise of this option. If HARADINE receives, prior to the date of closing, any income allocable to oil and/or gas produced from any well drilled by Buyer hereunder, Seller agrees to pay to Buyer all of such income at the time of closing.

". . . . . . . . . . . . . ."

in the official records of Monterey County. In the notice, he described himself as the "lessee" of the land described in the Alexander lease, incorporated a copy of the lease, and stated that he would "not be responsible to any mechanics, materialmen, or any other persons or organizations for the cost of any improvements, alterations or additions upon said land unless made on his order, and no order has been so given by him." At the same time, Haradine similarly recorded a "Notice" which was substantially identical to Steitz's except that it described Haradine as the "assignee of the lessee" of the leased land. Copies of both notices were posted on the affected land.

Also at or about the time the 1968 agreement was executed, Cannon commenced the drilling of the pilot well. Before or in the course of this operation, he negotiated with plaintiffs the aforementioned contracts under which they (plaintiffs) furnished him with materials and services which were actually used in drilling the well. Three representatives of the two plaintiffs testified at the trial concerning these transactions, which involved the extension of credit to Cannon alone. It was shown that the unpaid account of Cal-Cut Pipe & Supply, Inc., for materials furnished and used in the well, amounted to $17,839.30; and that the unpaid account of Bakersfield Drilling Company, Inc., for services rendered in actually drilling the well, amounted to $12,905.97.

The defense called Theodore H. Cominos, Haradine's attorney, who had participated in the negotiations between it and Cannon which had produced the 1968 agreement. Concerning these negotiations, Cominos testified as follows: In 1968, Haradine interpreted a provision of the Alexander lease as obligating it (Haradine), as lessee, to commence drilling an oil or gas well on the leased land at intervals of not less than six months or, in the alternative, to pay rent to the lessor on a per-acre, per-year basis; and, conversely, that Haradine could avoid paying rent as long as the six-month drilling schedule was met.[5] As one six-month deadline approached in 1968, Haradine "tried to get the cash from Joe Cannon to drill the well that was due or coming due. . . . We told him we wanted the money to drill the well. He said I [Cannon] need the option to raise the money. We worked the arrangement, which he would take over [*sic*] and drill the well *as consideration for the option*." (Italics

---

[5]This interpretation pertained to a so-called "delay rental provision" in the Alexander lease. (For a discussion of variations thereof as commonly used in oil and gas leases in California, see *Butler* v. *Nepple* (1960) 54 Cal.2d 589, 594 [6 Cal.Rptr. 767, 354 P.2d 239]; Comment (1960) 7 U.C.L.A. L.Rev. 344, 346-351.)

added.) Cannon expressed "his understanding of the option in that fashion." Cominos' testimony was uncontradicted.

The following facts were also shown at the trial, and were found by the trial court to have occurred (or not, as indicated): Cannon completed the pilot well (which was known as the "Alexander 6 well") to the point of operating it for a time as a producing well. He apparently did not exercise the option granted him in the 1968 agreement between him and Haradine, in the manner specified therein or at all.[6] Haradine terminated the agreement and took possession of the Alexander 6 well, its equipment and materials. Both plaintiffs thereafter recorded timely statements of the liens claimed by each pursuant to the Act, and the present actions were commenced within the time specified therein.

The trial court incorporated the substance of the above-recited facts in its findings and stated, further:

"From the foregoing facts, the court concludes:

### "CONCLUSIONS OF LAW

"1. That under . . . [the 1968 agreement between Haradine and Cannon] . . . and during the drilling of said Alexander 6 well by defendant Joe Cannon, on the lands covered by said Alexander leasehold estate, defendant Joe Cannon was the agent of defendant Haradine Petroleum, Inc.

"2. That the Notices of Non-Responsibility executed, recorded and posted by defendants Haradine Petroleum, Inc. and William P. Steitz are of no legal force and effect as against plaintiffs' claim [sic] of oil and gas liens."

Under the same caption ("Conclusions of Law"), the trial court also stated that each plaintiff had a valid lien in the respective amount claimed, that the amount due in each instance was to bear interest until entry of judgment, that "no judgment be had herein against Joe Cannon, who is now deceased," and that plaintiffs were not entitled to deficiency judgments against Haradine or Steitz.

On their appeal from the judgment entered accordingly (declaring the claimed liens and ordering their foreclosure), defendants Haradine and

---

[6]The evidence does not expressly show whether, after drilling the Alexander 6 well, Cannon (1) exercised the option but thereafter defaulted in payment of the purchase price to Haradine, or (2) failed to exercise the option at all; the trial court found only that he "did not pay the purchase price" to Haradine, which could be construed either way. In dialog at the trial, however, it appears to have been agreed that Cannon "did not exercise the option," and the parties agree in their briefs that this is so.

Steitz contend that neither plaintiff has a valid lien, pursuant to section 1203.52 of the Act, because Cannon was not an "owner" of the Alexander oil and gas leasehold, within the meaning of section 1203.51, subdivision (b), when they (plaintiffs) contracted with him for the materials and services he used in drilling the Alexander 6 well. As it is undisputed that Haradine was then an "owner" of the leasehold within the meaning of section 1203.51, subdivision (b), and because the definition of "owner" therein includes the "agent" of an owner, defendants specifically challenge the trial court's determination, in conclusion of law number 1, that Cannon was the "agent" of Haradine "under" the 1968 agreement. In response, plaintiffs argue that the trial court's determination of Cannon's agency is a finding of ultimate fact which we should treat as such despite its designation as a "conclusion of law," and which we must sustain if it is supported by substantial evidence.

### The Trial Court's Determination of Cannon's Agency Was a Conclusion of Law

■ Apart from the 1968 agreement itself, there was no evidence that Haradine appointed Cannon to act as its *actual* agent (Civ. Code, § 2296; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, §§ 79-81, pp. 700-702), or that it (Haradine) acted in such manner as to make him its *ostensible* agent (Civ. Code, §§ 2298, 2300; 1 Witkin, [*op. cit. supra*] § 83, pp. 703-704), at any time during the drilling of the Alexander 6 well; the testimony of plaintiffs' three witnesses was wholly to the contrary. Since Cannon did not *purport* to act as Haradine's agent at any such time, there was no evidence to support a finding that he became its agent upon the basis that it *ratified* his actions when it took over the well after the completion thereof. (See Civ. Code, § 2307; 1 Witkin [*op. cit. supra*] § 82, pp. 702-703.)

In the absence of any evidence that Cannon became Haradine's agent by reason of any events which occurred *after* the parties executed the 1968 agreement, we construe conclusion of law number 1 as a statement by the trial court that he was Haradine's "agent" at pertinent times but "under" the 1968 agreement only. This means that the statement was based upon the court's interpretation of the agreement itself (including the Alexander lease and the successive assignments thereof, all of which were attached to the agreement and incorporated therein by reference as stated in its article I), aided—or not—by extrinsic evidence of events which attended or preceded the execution of the agreement in 1968.

Apart from the full text of the 1968 agreement (including its exhibits), the only extrinsic evidence of such events was presented in the testimony

of Cominos. As previously stated herein, his testimony was uncontradicted. Moreover, and although it tended to explain how Haradine and Cannon came together in 1968, and Haradine's motivation fo rentering into the agreement, it did not reach the conclusion whether. Cannon became the "agent" of Haradine "under" the agreement as executed.[7] For either or both reasons, it appears that the trial court's interpretation of the agreement was solely a judicial function (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Gulf Ins. Co.* v. *Edgerly* (1973) 31 Cal.App.3d 334, 338 [107 Cal.Rptr. 246]), that the court's consequent determination that Cannon was the "agent" of Haradine ("under" the agreement) was a conclusion of law because "no issue of fact" existed under the circumstances (*Estate of Platt* (1942) 21 Cal.2d 343, 352 [131 P.2d 825]), and that the trial court properly designated it as such.

### Conclusion of Law Number 1 Was Incorrect

Because the trial court interpreted the 1968 agreement without the aid of extrinsic evidence, or upon the basis of unconflicting evidence, we are not bound by the result; we are required to interpret the agreement independently. (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861 at pp. 865-866; *Gulf Ins. Co.* v. *Edgerly, supra,* 31 Cal.App.3d 334 at p. 338.) ■ Having done this, we disagree with the trial court's conclusion that Cannon was the "agent" of Haradine "under" the agreement.

Nothing in the optionor-optionee relationship created in the agreement (see articles I, II and III thereof)[8] suggests that Cannon became the agent of Haradine for any purpose. In addition, Cannon agreed to drill the pilot well as his "sole risk, cost and liability" (article V); he further agreed to "hold Seller [Haradine] harmless therefrom" (*ibid.*), and the agreement permitted Haradine to claim nonresponsibility for the drilling operation by posting notices to that effect. (Article VI.) These provisions are inconsistent with the conclusion that Cannon was the "agent" of Haradine, "under" the agreement, because they expressly purport to preclude Haradine's vicarious

---

[7]Cominos did testify that Haradine approached Cannon for funds in the first instance, and that Cannon said that he would "need the option to raise the money." In addition, however, Cominos explicitly testified that the parties agreed that Cannon *"would take over* and drill the well in consideration for the option." (Italics added.) According to our view of Cominos' entire testimony; it does not support the inference that the parties intended the 1968 agreement to make Cannon the agent of Haradine, for the purpose of raising funds for it (Haradine) or for any other purpose.

[8]Hereinafter, all references to specific provisions of the 1968 agreement are addressed to footnote 4, *ante.*

liability for contractual obligations incurred by him in the drilling operation; such liability in Haradine would necessarily have followed if Cannon had incurred the obligations while acting as Haradine's "agent" and in the scope of his authority, and irrespective of whether the identity of Haradine as his principal had been disclosed to the obligees. (1 Witkin, *op. cit. supra*, Agency and Employment, § 147, pp. 749-750.)

Finally, nothing in the 1968 agreement reflects a "manifestation of consent" by Haradine that Cannon was to drill the pilot well subject to Haradine's *control* of the operation, or his "consent so to act." (See Rest. 2d Agency, § 1; *ibid.*, com. "a"; *Edwards* v. *Freeman* (1949) 34 Cal.2d 589, 592 [212 P.2d 883]; *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 513 [63 Cal.Rptr. 35, 432 P.2d 731].) Absent "the essential characteristic of the right of control" by the alleged principal, no 'agency exists. (*Edwards* v. *Freeman, supra,* at pp. 591-592; *Thompson* v. *Keckler* (1964) 228 Cal.App.2d 199, 215-216 [39 Cal.Rptr. 267]. Cf. 1 Witkin, *op. cit. supra*, Agency and Employment, §§ 10 [pp. 649-650], 12-13 [pp. 651-652].)

For the foregoing reasons developed from our independent interpretation of the terms of the 1968 agreement, we conclude that Cannon was not the "agent" of Haradine "under . . . [the agreement] . . . and during the drilling of . . . [the] . . . Alexander 6 well," as the trial court stated in conclusion of law number 1. It follows (1) that the conclusion is incorrect; (2) that Cannon may not be defined as an "owner" of the Alexander leasehold, within the meaning of section 1203.51, subdivision (b), of the Act, upon the basis of his having been the "agent" of the actual owner (Haradine) while the well was being drilled; and (3) that, plaintiffs having furnished materials and services under the contract with Cannon alone, the Act does not entitle them to liens upon such basis.

*Under the 1968 Agreement, Cannon Was*
*Nevertheless an "Owner" of the Alexander*
*Leasehold Within the Meaning of the Act*

The Act's definitions of an "owner" of an oil and gas leasehold are not limited to an actual "owner" thereof (as the term is used in a conventional sense) or "his agent"; they include "a person holding *any interest* in the legal or equitable *title* or both to any leasehold for oil or gas purposes . . ." (§ 1203.51, subd. (b) [italics added].) Defendants contend that Cannon, as a bare optionee under the 1968 agreement, held no "interest in the . . . title" to the leasehold because an option conveys no "title" (*Ware* v. *Quigley* (1917) 176 Cal. 694, 698 [169 P. 377]) and, conse-

quently, that the agreement did not make Cannon an "owner" of the Alexander leasehold within the meaning of the above-quoted definition. As will appear, however, the agreement granted Cannon more than a bare option to purchase the Alexander leasehold. ■ Moreover, any of the Act's definitions of an "owner" must be liberally construed in plaintiffs' favor; this is required by the Act itself[9] and by the Legislature's purpose in enacting it.[10] ■ By our interpretation of the 1968 agreement according to its terms, and our liberal construction of the above-quoted definition as required, the agreement made Cannon an "owner" of the Alexander leasehold at pertinent times.

In defining an "owner" of an oil and gas leasehold as "a person holding any interest in the . . . title" thereto (§ 1203.51, subd. (b)), the Legislature combined the words "interest" and "title" in language which incorporates the flexible definition accorded by the law to each. ". . . [T]he word 'title' carries a different meaning under different circumstances and in different relations. . . . As stated in *Skelly Oil Co.* v. *Kelly,* 134 Kan. 176 [5 Pac.(2d) 823, 824], 'The word *title* has a variety of meanings. It sometimes connotes the means by which property in land is established. . . . A common meaning is *complete ownership,* in the sense of all the rights, privileges, powers and immunities an owner may have with respect to land.' " (*Smith* v. *Bank of America etc. Assn.* (1936) 14 Cal.App.2d 78, 85 [57 P.2d 1363] [italics added].) " 'An *interest* in land is the legal concern of a person in the thing or property, or in the right to *some* of the benefits or uses from which the property is inseparable.' " (Italics added.) (*Brown* v. *Sweet* (1928) 95 Cal.App. 117, 124 [272 P. 614] [quoting *McDonald* v. *Bayard Sav. Bank* (1904) 123 Iowa 413 (98 N.W. 1025, 1026)].) "In common parlance the word 'interest' is broader and more comprehensive than the word 'title,' and its definition in a narrowed sense by lexicographers as any *right in the nature of property less than title* indicates that the terms are not considered synonymous. [Dictionary citations.]" (*Estate of Baldwin* (1943) 21 Cal.2d 586, 591 [134 P.2d 259] [italics added].)

---

[9] Section 1203.66 of the Act provides that it "shall be given liberal construction in favor of all persons entitled to any lien under it."

[10] Concerning the legislative purpose of the Act, one contemporary source stated in part: "Oil and Gas Lien Act. This act creates a new lien to secure payment for labor, services, or materials furnished in connection with the drilling or operation of a gas or oil well. It was sponsored by the Petroleum Equipment Suppliers Association *to eliminate the difficulties encountered in applying existing mechanic's and materialmen's liens to oil and gas leaseholds.*" (*1959 Legislation—Code of Civil Procedure* (1959) 34 State Bar J. 623, 677 [italics added].)

■ From the sources just quoted, we perceive that the Legislature intended the words "a person holding any interest in the . . . title . . . to any leasehold for oil or gas purposes," as used in section 1203.51, subdivision (b), to include a "person" who holds an "interest," less than "title," in an oil and gas leasehold to which "title" is held by another. We also conclude that the 1968 agreement granted to Cannon such an "interest," in the Alexander leasehold and at pertinent times, *in adition to* an option to purchase it.

■ Under the Alexander lease, the oil and gas leasehold (of which Haradine was an "owner" because it held "title" to it as the lessee by assignment) consisted of the right (in Haradine) to drill for and produce oil on the Alexander land. As held by Haradine, this right was a profit *a prendre,* which is "a right to remove a part of the substance of the land" and an *"interest* in real property in the nature of an incorporeal hereditament." (Italics added.) (*Dabney-Johnston Oil Corp* v. *Walden* (1935) 4 Cal.2d 637, 649 [52 P.2d 237] [quoted with approval in *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 879 (69 Cal.Rptr. 612, 442 P.2d 692), and in *Atlantic Oil Co.* v. *County of Los Angeles* (1968) 69 Cal.2d 585, 594 (72 Cal.Rptr. 886, 446 P.2d 1006)].)

Under article V of the 1968 agreement, Cannon became obligated to drill the pilot well, on the Alexander leasehold, forthwith. Because this provision necessarily involved his *right* to drill the well on the leasehold, it must be interpreted as a *grant* to him, by Haradine as an assignor, of the profit *a prendre* held by Haradine under the Alexander lease. The profit *a prendre* was validly assignable, by Haradine to Cannon, because it was an incorporeal hereditament (Civ. Code, § 1044; *Smith* v. *Cooley* (1884) 65 Cal. 46, 48 [2 P. 880]; *Callahan* v. *Martin* (1935) 3 Cal.2d 110, 113 [43 P.2d 788, 101 A.L.R. 871]), and because, for purposes of the present case, the Alexander lease did not prohibit or restrict its assignment by the lessee thereunder. (See fn. 3 [last paragraph], *ante*; 2 Witkin, Summary of Cal. Law (7th ed. 1960) § 301, pp. 1124-1125; Hightower, *op. cit. supra*, 3 U.C.L.A. L.Rev. 424 at p. 442.)

Haradine's grant of its profit *a prendre* to Cannon was limited by the terms of the 1968 agreement (1) in its scope, because the grant was limited to the drilling of one well only; (2) in point of time, because article V of the agreement required Cannon to commence drilling the one well "on or before November 3, 1968," and, by reasonable interpretation, to complete it before the terminable date of the option; and (3) in that article X of the agreement apparently provided that Haradine was to own the oil (if any)

produced from the single well during the option period. ("Seller shall be entitled to all production during the option period.")

However, the first limitation did not diminish or affect the character of Haradine's grant of its profit *a prendre* in the 1968 agreement: Cannon's right to drill a single well was sufficient to make him the grantee thereof. The only effect of the second limitation was that the agreement granted Cannon a profit *a prendre* of limited duration, which made it a "chattel real" (*Dabney-Johnston Oil Corp.* v. *Walden, supra,* 4 Cal.2d 637 at p. 649), as distinguished from the "determinable fee" held by Haradine under the "thereafter" language of the habendum clause in the Alexander lease (see fn. 3, *ante; Dabney* v. *Edwards, supra,* 5 Cal.2d 1 at p. 12; *Montana-Fresno Oil Co.* v. *Powell, supra,* 219 Cal.App.2d 653 at pp. 659-662 and cases cited); the "chattel real" was nonetheless an *interest* (i.e., an "estate") in the Alexander leasehold. (*Dabney-Johnston Oil Corp.* v. *Walden, supra.*)

Although the third limitation prevented Cannon from acquiring title to the oil removed from the pilot well during the option period, it was qualified by the further provision in the 1968 agreement which entitled him to collect from Haradine, "at the time of closing" (i.e., if and when he exercised his option to acquire the Alexander leasehold), any income which had been received by Haradine and which was "allocable to oil and/or gas produced from" the pilot well during the same period. (Article XIV.) By our interpretation of the two provisions in combination, they permitted Cannon to realize the fruits of the profit *a prendre,* granted by Haradine in the agreement, on a deferred basis and at his option; they did not operate to grant him anything less than the profit *a prendre* identified above.

That profit *a prendre* having been granted to Cannon in the 1968 agreement, he thereafter held (at such pertinent times) an "interest in the . . . title" to the Alexander leasehold according to our construction of the quoted words as used by the Legislature in defining the "owner" of an oil and gas leasehold in section 1203.51, subdivision (b), of the Act. Cannon having therefore been an "owner" of the leasehold when plaintiffs contracted with him to furnish the materials and services used in the pilot well, plaintiffs' liens are valid and enforceable, as claimed, pursuant to section 1203.52. In this regard, the trial court's conclusion of law number 2 (quoted *supra*) was correct; as it states, the notices of nonresponsibility which were executed, recorded, and posted by defendants "are of no legal force or effect" because the Act does not provide for such notices or such effect.

For the record, we hereinafter modify the trial court's conclusion of law number 1 (quoted *supra*) by striking therefrom the words "defendant Joe Cannon was the agent of defendant Haradine Petroleum, Inc.," and inserting in lieu thereof the words "defendant Joe Cannon was an owner of said leasehold estate."

The trial court's "conclusion of law" number 1 is modified to read as herein provided. The judgment is affirmed.

Devine, P. J., and Bray, J.,* concurred.

A petition for a rehearing was denied December 12, 1973, and appellants' petition for a hearing by the Supreme Court was denied January 31, 1974.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.