[No. F014930. Fifth Dist. Apr. 22, 1992.]

GARY COATES, Plaintiff and Appellant, v.
SHELL WESTERN E & P, INC., Defendant and Respondent.

COUNSEL

Arrache, Clark & Potter and David B. Potter for Plaintiff and Appellant.

John B. Linford for Defendant and Respondent.

## OPINION

**MARTIN, Acting P. J.**—Summary judgment was entered against appellant Gary Coates and in favor of respondent Shell Western E & P, Inc. (Shell) in appellant's action to foreclose an oil and gas lien against certain oil and gas leasehold interests of Shell.

Both parties agree that this is a case of first impression in construing the Oil and Gas Lien Act (Code Civ. Proc., §§ 1203.50-1203.66); that there are no questions of fact and only one issue of law presented, i.e., whether appellant performed work, labor and services on real property covered by an oil and gas lease entitling appellant to an oil and gas lien as opposed to a mechanic's lien.

### STATEMENT OF THE CASE AND FACTS

There is no dispute between the parties as to the facts of this case and therefore the statement of the case as set forth in appellant's opening brief is hereby adopted with appropriate modifications.

Appellant Gary Coates is a sole proprietor who does business under the name of Tes-Key Backhoe & Dumptruck Service. Appellant is in the construction business. A portion of his business is the provision of construction services at oil and gas production facilities.

Respondent is a lessee under several oil and gas leases covering lands located in the Paloma Field in Kern County, California. Shell purchased these leases in 1984 from the Marathon Oil Company. It is the attempted foreclosure of Shell's interest in the Paloma Field oil and gas leases which is the subject of this action.

When the leases were acquired from Marathon Oil Company in 1984, there were very few producing oil or gas wells located on the leased premises. After acquiring the leases, Shell did not engage in any oil or gas drilling or development work.

Sometime in late 1988, upon the request of a surface owner who farms the leased land, Shell decided to remove the unused and abandoned pipelines located on the leases to eliminate possible interference with the surface owner's farming operations. Some years previously, the pipelines had been used to transport oil and gas from the site of the original production to a storage facility and were known as "shipping lines."

On February 14, 1989, Shell entered into a written agreement with defendant Cal Cut Steel, Inc. (Cal Cut) to excavate, dismantle and remove the unused and abandoned shipping lines from the oil and gas leases at Shell's Paloma Field. Under the terms of this agreement, Shell agreed to pay Cal Cut with the pipe to be removed from the ground.

On February 17, 1989, appellant and Cal Cut entered into a written subcontract to dismantle and remove the shipping lines at the Paloma Field. Under the subcontract, appellant was obligated to make specified types of cuts at specified footage along the pipelines, dismantle the pipe, use reasonable care to protect the pipe, and remove it to agreed upon locations. Appellant also accepted responsibility for handling hazardous chemicals and materials and agreed to furnish all necessary tools and equipment to perform the services.

Invoices generated by the project were to be paid every two weeks in accordance with a rate sheet attached to the subcontract.

Appellant performed all terms and conditions required by the subcontract between March 8, 1989, and April 7, 1989, and presented his invoices to Cal Cut in accordance with the contract. Cal Cut failed to pay appellant the sum of $63,095.23. There is no dispute as to the amount owed appellant for services provided pursuant to the February 17, 1989, contract. It is also

undisputed that appellant's relationship with Cal Cut is that of a "subcontractor" to a general contractor as that term is used in section 1203.54 of the Code of Civil Procedure.[1]

At least one representative from Shell was always present at the construction site while subcontract work was being performed.

On July 26, 1989, appellant recorded a statement of lien claim under the Oil and Gas Lien Act (Act) encumbering Shell's interest in the oil and gas leases where the services were performed. The statement of lien created an encumbrance for the sum of $63,095.23 for services and labor performed between the dates of February 23, 1989, and April 7, 1989, together with interest as set forth on the lien.

On September 28, 1989, appellant filed the complaint in this action against Cal Cut and Shell. The complaint alleges the foreclosure of an oil and gas lien against Shell and the breach of contract and common counts against Cal Cut for $63,095.23. Both Shell and Cal Cut filed answers to the complaint.

On May 4, 1990, appellant filed a motion for summary judgment or, in the alternative, for summary adjudication of issues against Shell and Cal Cut (§ 437c). Cal Cut failed to respond to the motion for summary judgment.

Shell opposed the motion for summary judgment and filed its own motion for summary judgment and summary adjudication of issues against appellant.

The only material question in dispute was whether appellant is entitled to an oil and gas lien under section 1203.52.

In its ruling on the cross-motions for summary judgment, the trial court ruled that appellant was not a person entitled to an oil and gas lien. Therefore, the court granted judgment in favor of appellant as against Cal Cut[2] but ruled in favor of Shell on Shell's motion for summary judgment. Pursuant to these rulings, a judgment was entered in favor of Shell and appellant filed a timely notice of appeal.

### Discussion

*A. Introduction.*

Subdivision (c) of section 437c provides:

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2]On July 10, 1990, summary judgment was granted against Cal Cut in the sum of $63,095.23 plus prejudgment interest.

"The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact."

Summary judgment is proper only if the evidence in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by admissible evidence show facts sufficient to present a triable issue of fact. (*Los Angeles County-U.S.C. Medical Center* v. *Superior Court* (1984) 155 Cal.App.3d 454, 458 [202 Cal.Rptr. 222].) It is well established that summary judgment cannot be ordered for the moving party, even though the affidavits of the opposing party are insufficient or absent, unless the moving party presents affidavits in support of his motion which comply with section 437c and establish the moving party is entitled to judgment. (*de Echeguren* v. *de Echeguren* (1962) 210 Cal.App.2d 141, 147 [26 Cal.Rptr. 562].)

A defendant, when moving for summary judgment " 'must conclusively negate a necessary element of the plaintiff's case or establish a complete defense and thereby demonstrate that under no hypothesis is there a material factual issue which requires the process of a trial.' " (*Los Angeles County-U.S.C. Medical Center* v. *Superior Court, supra,* 155 Cal.App.3d at p. 459, quoting *Saatzer* v. *Smith* (1981) 122 Cal.App.3d 512, 517 [176 Cal.Rptr. 68].) However, in that summary judgment effectively denies the right of an adverse party to a full trial of the case, it should be used with caution. Any doubts as to the propriety of granting such motion should be resolved against the moving party. (*Blackwell* v. *Phelps Dodge Corp.* (1984) 157 Cal.App.3d 372, 379 [203 Cal.Rptr. 706]; *Ferrell* v. *Southern Nevada Off-Road Enthusiasts, Ltd.* (1983) 147 Cal.App.3d 309, 313 [195 Cal.Rptr. 90].)

*B. Whether Coates is a person entitled to an oil and gas lien under section 1203.50 et seq.*

The parties agree that no issue of fact is presented and there is no debate as to whether appellant is a subcontractor as defined by section 1203.54. The only question presented, one that was resolved against appellant by the trial court, is whether appellant is a person entitled to an oil and gas lien under

the provisions of section 1203.50 et seq. on the basis that the work or labor performed by appellant was furnished or used in the drilling or operating of any oil or gas well.

Prior to enactment of the Act (§ 1203.50 et seq.), there was no statute specifically entitling a person who furnishes labor or materials for the drilling of oil wells or the development of oil property to a mechanic's or materialman's lien. However, the statute entitling persons who furnish work on and materials for mining claims to liens under the same conditions as provided for mechanics' and materialmen's liens in general (now Civ. Code, § 3060) was applicable to persons who performed labor on an oil well and persons who furnished materials for the drilling of an oil well. (*Cain* v. *Whiston* (1943) 58 Cal.App.2d 738, 741 [137 P.2d 479]; *McCreary* v. *Toronto Midway Oil Co., Ltd.* (1918) 38 Cal.App. 17, 19-20 [175 P. 87].) The use of the former statute could work a hardship on the owner of the real property. ■ However, under the current law, the owner of the land is unaffected by the lien. The lien attaches to the leasehold interest and the equipment at the drill site and upon the proceeds of the gas or oil that is produced. Simply put, the lien applies to the lessee's interest only.

Under the Act as it now reads, any person who, under contract with the owner of any leasehold for oil or gas purposes, performs labor or furnishes any material or services used or employed in the drilling or operating of any oil or gas well upon the leasehold, or in the constructing, putting together, or repairing of any materials so used or employed, is entitled to a lien for the amount due for such labor performed or materials or services furnished within six months prior to the date of recording the statement of lien. This is true whether or not a producing well is obtained and whether or not such material is incorporated in or becomes a part of the completed oil or gas well. (§ 1203.52.)

The Act is to be given a liberal construction in favor of all persons entitled to any lien under it. (§ 1203.66; *Cal Cut Pipe & Supply, Inc.* v. *Haradine Petroleum, Inc.* (1973) 35 Cal.App.3d 359, 370, fn. 9 [110 Cal.Rptr. 666].)

The Act sets forth definitions of various terms therein. Those definitions pertinent to the issue presented are:

"(h) 'Drilling' means drilling, digging, shooting, torpedoing, perforating, fracturing, testing, logging, acidizing, cementing, completing or repairing.

"(i) 'Operating' means all operations conducted on the lease in connection with or necessary to the production of oil or gas, either in the development thereof or in working thereon by the subtractive process.

"(j) 'Construction' means construction, maintenance, operation, or repair, either in the development thereof or in working thereon by the subtractive process." (§ 1203.51.)

 Appellant argues he is entitled to an oil and gas lien because his services were used in the "operation" of Shell's oil and gas leases or, in the alternative, in the "repair" of Shell's equipment. Appellant invites our attention to the definition of the term "operating" as given above in section 1203.51, subdivision (i) and the inclusion of the term "repair" in subdivisions (h) and (j) of the same section. Appellant contends his work was conducted on the lease in connection with the production of oil or gas, in the working thereon by the subtractive process. Appellant removed oil and gas shipping lines that were no longer being used when Shell elected to remove them at the request of the surface farmer. Appellant contends the oil and gas lease required the removal of these abandoned shipping lines; in the alternative, appellant argues it "would be sound practice for [respondent] to remove unused pipelines."

It is appellant's contention that "The life of an oil and gas leasehold starts with the drilling process. If the oil and gas explorers experience a 'dry hole,' no shipping lines would ever be installed. Once oil or gas is discovered, shipping lines are installed and they carry away the products of development to a place where they can be aggregated, removed or refined. This is the 'subtractive process.'

"Once the oil and gas lease no longer produces, the oil and gas lease is abandoned. *The removal of the equipment and the shipping lines is the end of the 'subtractive process.'* Even though the removal of the shipping lines comes at the end of the subtractive process, it is still an integral part." (Italics added.)

By including removal of the equipment and the shipping lines as part of the "subtractive process," appellant would qualify by definition as a person entitled to a lien under the Act.

Respondent, on the contrary, argues:

"It is plain from the language of the Oil and Gas Lien Act itself that its provisions were intended to embrace those persons whose work upon an oil and gas lease consists of, contributes to, or is connected with the attempted exploration for and production or extraction of hydrocarbon substances. Whether or not the exploratory or producing efforts are successful is immaterial to the qualified lien claimant because Section 1203.52 provides for a

lien 'whether or not a producing well is obtained.' Instead, under the statutory scheme, it is the character of the work in connection with the purpose or end-result sought to be achieved—the extraction of hydrocarbon substances ('subtractive process')—that determines whether the claimant may qualify for an oil and gas lien."

In other words, respondent contends this special type of lien is limited to those persons who perform labor or furnish services or materials used or employed in the drilling or operating of an oil or gas well. The work performed by appellant after the well ceased to produce hydrocarbon substances is not labor included in the statutory scheme.

Section 1203.52 provides:

"Any person who shall, under contract with the owner of any leasehold for oil or gas purposes perform any labor or furnish any material or services used or employed, or furnished to be used or employed in the drilling or operating of any oil or gas well upon such leasehold, or in the constructing, putting together, or repairing of any material so used or employed, or furnished to be so used or employed, shall be entitled to a lien under this chapter, whether or not a producing well is obtained and whether or not such material is incorporated in or becomes a part of the completed oil or gas well, for the amount due him for any such labor performed, or materials or services furnished, within six months prior to the date of recording the statement of lien as provided in Section 1203.58, including, without limitation, shipping and mileage charges connected therewith, and interest from the date the same was due."

The parties and this court have found little legal authority to aid us in deciding whether or not appellant's services performed in removing these unused and abandoned pipelines would qualify appellant as a person entitled to the remedy set forth in the Act.

Respondent relies primarily on the case of Cain v. Whiston, supra, 58 Cal.App.2d 738. There, the Fourth District Court of Appeal held in an action for foreclosure of a mechanic's lien pursuant to then section 1183 on a derrick and drilling rig installed on certain real property, a judgment enforcing a lien upon "all rig accessories and equipment," which were part of this oil well rig, was erroneous as including articles and equipment used in the drilling of the well which was not a part of the improvement erected by the plaintiffs. The plaintiffs in Cain were subcontractors hired by the general contractor to move and install an oil derrick and drilling rig onto the leased premises of an oil and gas lessee for the purposes of drilling a well. The

labor performed and services and materials furnished by the *Cain* plaintiffs was for the purpose of the construction of a cement foundation and pipe racks for the oil derrick. When the general contractor failed to pay the plaintiff subcontractors, the plaintiffs recorded a notice of claim of lien under then existing section 1183 (now §§ 3060 and 3110 et seq. of the Civil Code).

The Fourth District Court of Appeal held that although the plaintiffs were not entitled to an enforceable lien under paragraph 2 of section 1183 (the mining lien provision), the provisions of paragraph 1 of section 1183 (the general lien provisions now embodied in §§ 3110-3154 of the Civil Code governing mechanics' liens) were applicable and plaintiffs were entitled to a lien thereunder.

In reaching its holding the *Cain* court reasoned: "Although this improvement [erected by the plaintiffs] was later used in drilling an oil well the labor and materials were not furnished while any mining operations were being carried on." (*Cain v. Whiston, supra,* 58 Cal.App.2d 738, 741.)

Respondent argues that because the labor and materials performed and furnished by the *Cain* plaintiffs were not performed or furnished in the "subtractive process" of drilling for, producing, or otherwise attempting to extract oil and gas from the premises, the plaintiffs had no enforceable lien under the mining lien provisions of the statute. The *Cain* court did, however, reject the oil and gas lessee's contentions that a general or mechanic's lien was not available for the labor performed by the plaintiffs. As in *Cain,* respondent urges this court to conclude that appellant Coates had available the remedy of the mechanic's lien.

As respondent concedes, *Cain v. Whiston* is not controlling here. We also fail to find *Cain* persuasive or instructive as *Cain* was clearly decided before the passage of the Act and the statutes considered by the *Cain* court did not include the definitions and expanded statutory language now in effect nor the provision that the sections be "given liberal construction in favor of all persons entitled to any lien under it." (§ 1203.66.)

There appears little doubt under the current provisions of the Act that installing the pipe for the purposes of subtracting hydrocarbon substances would be protected under the Act. However, appellant is asking us to conclude that removing the same pipe after the wells are abandoned is still a part of the "subtractive process," i.e., a part of the maintenance and repair of the oil or gas well.

In 1959, the same year in which the pertinent legislation was passed, the following appeared in the State Bar Journal regarding the legislative purpose of the Act:

"Oil and Gas Lien Act: This act creates a new lien to secure payment for labor, services, or materials furnished in connection with the drilling or operation of a gas or oil well. It was sponsored by the Petroleum Equipment Suppliers Association to eliminate the difficulties encountered in applying existing mechanic's and materialmen's liens to oil and gas leaseholds. Only the lessee's interest is attached. Royalty interests, land owner's interests, or overriding royalties are not affected." (*Selected 1959 Code Legislation—Code of Civil Procedure* (1959) 34 State Bar J. 581, 623, 677.)

Thus, the purpose of the Act was to eliminate the difficulties encountered in applying existing mechanic's and materialmen's liens to oil and gas leaseholds. (*Selected 1959 Code Legislation—Code of Civil Procedure, op. cit. supra*, 34 State Bar J. at pp. 623, 677.)

The word "subtract" is derived from the Latin word *subtractus*, a past participle of *subtrahere*, to draw away underneath, subtract. It is defined as "1 to take away (a part from a whole) 2 to take away or deduct (one number or quantity from another)." (Webster's New World Dict. (3d college ed. 1988) p. 1336.) "Subtractive" is an adjective defined as "1 tending to subtract 2 capable of or involving subtraction 3 that is to be subtracted; marked with the minus sign (-)." (*Ibid.*)

*Cal Cut Pipe & Supply, Inc.* v. *Haradine Petroleum, Inc., supra*, 35 Cal.App.3d 359 involved an action to foreclose an oil and gas lien by two corporations which furnished material and services to an oil driller for the drilling of a pilot well. The trial court found at the time of the contract between the driller and the corporation for material and services the driller was operating under an agreement with the assignee of the oil and gas leasehold obligating the driller to drill a pilot well; that the driller was the agent of the owners of the leasehold, and therefore an "owner" within the meaning of the Act; and that the lien was enforceable against the owners of the leasehold, the driller having died, and the court entered judgment accordingly. The First District Court of Appeal affirmed, after modifying the trial court's conclusion of law that the driller was the agent of the assignee of the leasehold. The Court of Appeal found instead the driller was an owner within the meaning of the Act. The terms of the agreement between the driller and the assignee granted the driller the right to drill the pilot well, which was interpreted as a grant of a profit *a prendre*, a sufficient interest in the title to make the driller an owner within the meaning of the Act. In so doing, the Court of Appeal looked to the requirements of the Act and the Legislature's purpose in enacting it. The court liberally construed the definition of an "owner" in favor of the lien claimant. (*Id.* at p. 370.)

However, as one can see, *Cal Cut* offers very little guidance as to how to interpret the statute as applied to the facts of the instant case and is clearly

distinguishable. We are not concerned here with who comes within the meaning of the Act, i.e., who is entitled to a lien, but rather the type and nature of services that are properly considered part of the subtractive process.

The aim of statutory construction is the ascertainment of the legislative intent in order that the purpose of the law may be effectuated. (*People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322]; *Standard Fruit & Steamship Co. v. Metropolitan Stevedore Co.* (1975) 52 Cal.App.3d 305, 310 [125 Cal.Rptr. 111].) Statutes must be given a fair and reasonable interpretation, with due regard to the language used and the purpose sought to be accomplished. (*Cedars of Lebanon Hosp. v. County of L.A.* (1950) 35 Cal.2d 729, 735 [221 P.2d 31, 15 A.L.R.2d 1045].) The language of an enactment controls the construction, though extraneous aids may be resorted to where the language is ambiguous and the legislative intent not clearly ascertainable. But if the legislative intent is clearly expressed on the face of the statute, its meaning cannot be challenged. (See *People v. Chambers* (1972) 7 Cal.3d 666, 674 [102 Cal.Rptr. 776, 498 P.2d 1024].) A construction that will lead to a conclusion not contemplated by the Legislature, occasion great inconvenience, inequality, or injustice, or lead to absurd and unfair consequences is to be avoided. (*Westinghouse Electric Corp. v. Superior Court* (1976) 17 Cal.3d 259, 268 [131 Cal.Rptr. 231, 551 P.2d 847]; *Estate of Jacobs* (1950) 100 Cal.App.2d 452, 458-459 [131 Cal.Rptr. 231, 551 P.2d 847].)

Under the Act a lien is granted to any person who performs "any labor or furnish[es] any material . . . used or employed, or furnished to be used or employed in the drilling or operating of any oil or gas well upon such leasehold, or in the constructing, putting together, or repairing of any material so used or employed, or furnished to be so used or employed . . . whether or not such material is incorporated in or becomes a part of the completed oil or gas well . . . ."

The Act authorizes mechanics' liens not only for laborers and materialmen involved in the construction of an oil and gas facility, but also for laborers and materialmen involved in the operation and maintenance of such a facility. On the face of the statute, it does not appear the legislators, in enacting section 1203.52, contemplated work performed on the previously described facilities after usage and production of the well had ceased. We find nothing in the case law or any other published material that would lend itself to such a conclusion.

This is not to say that Coates was without a remedy. Rather, it is our view that we must find the Act does not, and was not intended by the Legislature

as written, to extend the application of the oil and gas lien provisions of section 1203.52 to labor and materials furnished to dismantle and/or remove equipment originally used or employed in the drilling or operating of any oil or gas lease as defined by the Act. It is our conclusion the "subtractive process," as contemplated by the Act, is complete or terminates upon a permanent cessation of operation and/or abandonment of the field. Coates's proper remedy was to pursue a mechanic's or materialman's lien as provided for in Civil Code section 3109 et seq.

Thus, we find the trial court did not err in granting summary judgment in favor of respondent Shell.

The judgment is affirmed. Respondent is awarded costs on appeal.

Ardaiz, J., and Dibiaso, J., concurred.